Lola Agnes WEST, Appellant,

v.

The AUSTIN NATIONAL BANK, Inde-
pendent Executor et al., Appellees.

No. 14618.

Court of Civil Appeals of Texas.

San Antonio.

March 6, 1968.

Rehearing Denied April 3, 1968.

Arnold Franklin, Jourdanton, for appellant, Lola Agnes West.

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Robert J. Hearon, Jr., Austin, for appellee, Austin Nat. Bank.

Archer & Archer, Maloney, Black & Hearne, Thomas Black, Austin, for appellees, Lola Pearl Holley and others.

CADENA, Justice.

This is a trespass to try title suit involving the rights of plaintiff, Lola Agnes West, widow of J. H. West (hereinafter called "testator"), in a ranch in Frio County. Under the terms of testator's will, his interest in the ranch passed to his son, Marvin West, now deceased, and his three married daughters, Lela Pearl Holley, Mary Lee Jones and Velma Nettie Keller. Defendants in this suit are the three married daughters of testator, along with Lorene West, widow of Marvin West and sole beneficiary under his will, and The Austin National Bank, independent executor of testator's estate.

Plaintiff and testator were married to each other for the second time on March 5,

**908**

1956. On January 8, 1957, Grande Oil Company, a corporation, executed a deed conveying the ranch in question to testator for a total consideration of $19,629.75. The transaction was apparently consummated two days later, January 10, 1957, at which time testator paid Grande Oil Company $4,000.00 and executed his promissory note in the amount of $15,629.75, representing the unpaid portion of the purchase price. This note was paid in full prior to testator's death in four payments as follows: $1,735.95, paid on August 2, 1957; $4,772.88, paid on September 8, 1958; $10,009.95, paid on December 21, 1959; and $1,000.00, paid on December 1, 1961.

The trial court held that the $15,629.75 promissory note executed by testator evidenced an indebtedness of the community estate of plaintiff and testator. This conclusion is not challenged. However, the trial court, finding that the initial payment of $4,000.00 on the purchase price of the ranch was made from testator's separate estate, decreed that the separate estate of testator owned an undivided 4000/19629.75 interest in the ranch. In addition, the trial court, finding that $11,509.95 of testator's separate funds were used in paying the community indebtedness evidenced by the $15,629.75 note, impressed a lien in that amount against the undivided 15629.75/19629.75 community interest in the ranch. Finally, the trial court held that, at the time of testator's death on August 23, 1963, the ranch was the homestead of testator and plaintiff, and awarded plaintiff homestead rights in 200 acres of the ranch.

All parties have appealed from the judgment below. Plaintiff, by way of "no evidence" and "insufficient evidence" points, complains of the trial court's finding that the initial $4,000.00 payment on the ranch was made with testator's separate funds and that $11,509.95 of testator's separate funds were used in liquidating the indebtedness of $15,629.75, representing the remaining portion of the purchase price. In the same manner, defendants attack the finding that, at the time of testator's death,

the ranch was the homestead of plaintiff and testator, and complain further that, in view of the evidence, the trial court erred in not giving testator's separate estate credit for the September 8, 1958 payment of $4,772.88 on the purchase price of the ranch.

We consider first the questions relating to the respective interests of testator's separate estate, on the one hand, and the community estate of plaintiff and testator, on the other, in the ranch.

■ Under the provisions of Article 4619, Vernon's Ann.Civ.St., the ranch is deemed to be the community property of plaintiff and testator, and the burden was on defendants to show otherwise. At about the time the ranch was conveyed to testator he sold certain lands, concededly his separate property, to his son, Marvin West, who was deceased at the time this case was tried. On January 10, 1957, the date on which the down payment of $4,-000.00 was made, defendant Lorene West, the wife of Marvin West, signed a check in the sum of $5,039.28, payable to testator. This check, which appears in the record as one of defendants' exhibits, has on the face thereof the notation, "Down payment on lots 176, 177." The back of this check bears the endorsement of testator, and a stamp showing that it was first presented to a bank, the Frost National Bank of San Antonio, on January 15, 1957, five days after the $4,000.00 payment was made.

Even if it be assumed that the $5,039.28 check was given to testator as partial payment for the conveyance of his separate property to his son, this evidence is insufficient to support the finding that the January 10, 1957, payment of $4,000.00 by testator was made from his separate funds. The record does not disclose whether testator made the $4,000.00 payment in cash or by check. If he paid cash, then he made such payment five days before the check was presented to any bank for payment, and it is obvious that he could not have used the proceeds of such check in making

that payment. Nor is defendants' position strengthened if we assume that testator made the initial payment by check. If the payment was made by check, the record does not disclose the bank on which such check was drawn. This evidence, therefore, fails to disclose any connection whatever between the $4,000.00 paid by testator on January 10, 1957, and the proceeds of the sale of his separate land.

■ Plaintiff testified that, at some specified time after the acquisition of the ranch, testator told her he had used the proceeds from the sale of his separate property to Marvin West for the purpose of making the initial $4,000.00 payment on the ranch. Defendants contend that plaintiff's silence in the face of such assertion by testator constitutes an admission by plaintiff that such payment had its source in testator's separate funds. It is true that a party's silence in the face of a statement made by another may warrant an inference of assent to the correctness of the communication. However, the rule applies only when no other explanation is equally consistent with silence. 4 Wigmore, Evidence, § 1071 (3rd ed. 1940). Plaintiff testified that she knew nothing of the transaction in question and had no knowledge of the family's financial affairs, since testator kept her in the dark concerning such matters, and all bank statements and cancelled checks were kept in a lock-box to which she had no access. Therefore, she said, at the time testator made the statement to her, she did not know whether it was true or not.

■ Here, testator's statement referred to his past conduct and there is nothing in the record to indicate that plaintiff had any knowledge of such past conduct on the part of testator. Under such circumstances, to say that one's silence implies assent to all that may be said in his presence is to state a gross absurdity. A listener's silence cannot be said to connote assent to a statement relating to facts which are not within the listener's knowledge. If the statement refers to facts not within the knowledge of the listener, no inference whatever can be drawn from his silence. The claimed "admission" will not support the finding that the $4,000.00 payment was made from testator's separate funds.

■ Defendants next contend that testator's statement to plaintiff has probative force under the holdings of such cases as John Hancock Mutual Life Ins. Co. v. Bennett, 159 S.W.2d 892 (Tex.Civ.App.— Waco 1942, writ ref'd w. o. m.). But in Bennett, and cases like it, the decedent's statements concerned his plans or intentions. Here, the declaration in question did not relate to testator's present intent or future plans but, as pointed out above, related to his past conduct. There is no rule making admissible statements of declarants, whether deceased or not, as to their past conduct. 1 McCormick & Ray, Texas Law of Evidence, § 895, p. 670 (2d ed. 1956). The cases, such as Compton v. Dannenbauer, 120 Tex. 14, 35 S.W.2d 682, 79 A.L.R. 1488 (1931), admitting declarations of a decedent relating to his prior conduct in connection with the making or revocation of a will announce a rule limited to will cases and are not applicable here.

■ While it is true that not all self-serving declarations are ipso facto inadmissible, the self-serving nature of testator's statement shears it of whatever probative value may be accorded to declarations against interest.

We have given no consideration to the excluded testimony of defendant Lorene West to the effect that the $5,039.28 check was given by her to testator as partial payment for the conveyance of testator's separate land to her husband, Marvin West, and that testator told her that he was going to use the money to pay for the ranch. Defendants present no point complaining of the exclusion of this testimony, which appears in the statement of facts only as part of defendants' bill of exception. We reject defendants' contention that, since the trial court found that testa-

tor's separate funds were used in making the $4,000.00 payment, and since the testimony of Lorene West tends to support that finding, we should assume that the trial court, after expressly ruling such evidence inadmissible, subsequently and secretly reversed such ruling and decided to admit and consider such evidence.

We conclude that the trial court erred in awarding testator's separate estate an interest in the ranch on the theory that the initial payment was made from his separate funds.

The court below found that testator's separate funds, in the total amount of $11,509.95, were used in paying the community indebtedness evidenced by the $15,629.75 promissory note. Since plaintiff admits that the $10,009.95 payment made on December 21, 1959, was made from testator's separate funds, plaintiff's dissatisfaction with this finding is limited to the fact that testator's separate estate was given credit for an additional payment of $1,500.-00. As is shown by the discussion to follow, it is apparent that the trial court was of the opinion that, of the $1,735.95 payment made on August 2, 1957, $1,500.00 represented testator's separate funds.

All money realized from the operation of the ranch was deposited by testator in the Security State Bank in Pearsall, in an account carried solely under testator's name. On July 24, 1957, the balance in this account was $794.40. On July 31, 1957, this balance was increased to $2,294.40 by the deposit of a check, dated July 22, 1957, in the amount of $1,500.00, signed by defendant Lorene West and payable to testator. On the same date, testator signed a check in the sum of $1,735.95, payable to the Alamo National Bank of San Antonio for deposit to the account of Grande Oil Company, holder of the promissory note representing the unpaid balance of the purchase price of the ranch. The note bears the notation that a payment of $1,735.95 was made thereon on August 2, 1957. On August 1, 1957, an additional deposit of $1,-000.00 was made in testator's account at

the Security State Bank, the bank on which the $1,735.95 check was drawn, increasing the balance in such account to $3,294.40. On August 3, 1957, the $1,735.95 check was paid by the Security State Bank.

Defendant Lorene West attempted to testify that the $1,500.00 check, signed by her on July 22, 1957, was given as partial payment for the separate property which testator had conveyed to Marvin West in January, 1957, but the trial court excluded this evidence and defendants present no point complaining of this ruling.

■ Under this state of the record, there is no evidence tending to show that the $1,500.00 deposited by testator on July 31, 1957, constituted his separate funds. Even if it be assumed that Marvin West was still indebted to testator for a portion of the purchase price of that property, there is no evidence that this was the only money owed testator by his son, so that the July 22, 1957, payment would be referable to the liquidation of that sole debt. Defendants clearly had the burden of showing that testator's separate funds were used in making the August 2, 1957, payment. The unexplained receipt of money by testator two days before the making of such payment is, at best, no more than a mere scintilla of evidence that such money was his separate property.

Defendants contend that the trial court erred in not finding that testator used his separate funds in making the September 8, 1958, payment of $4,772.88. The following summary of the evidence, which we consider to be a not unfavorable presentation of defendants' position, is taken from defendants' brief.

On July 31, 1958, testator contracted to convey certain land in the City of Mercedes, admittedly testator's separate property, to C. L. Curtis for $5,500.00. The contract provided for a down payment by Curtis of $550.00, with the balance of $4,950.00 to be paid in cash at the time the transaction was closed. Plaintiff testified that the escrow agent, if present at the

trial, would testify that the transaction was closed according to the terms of the contract "on or about thirty days after the date of the contract," or on or about August 30, 1958. Giving to this testimony and the accompanying stipulation its strongest effect, it would appear that on or about August 30, 1958, testator received from Curtis the sum of $4,950.00.

Assuming that testator, on or about August 30, 1958, one week before the $4,772.88 payment was made, received $4,950.00 from Curtis, which amount would be testator's separate property, at this point we completely lose track of this money. Whether Curtis made the payment in cash or by check is not disclosed, nor are we furnished a clue as to the history of this money between the time that testator received it and the time he made the $4,772.88 payment one week later. This money is not traced into any bank account, lock-box or secret hiding place. We do not know whether testator made the $4,772.88 payment in cash or by check.

Defendants contend that since the evidence discloses that all community funds were deposited in the Security State Bank, and since the records of such bank disclose neither a deposit of $4,950.00 at or around the relevant period of time nor a check drawn on such account by testator in the amount of $4,772.88, this compels the conclusion that the September 8, 1958, payment was made out of other than community funds. The only evidence relating to the Security State Bank account is the testimony of plaintiff to the effect that all proceeds from the operation of the ranch were deposited in such account. There is no evidence indicating that the income from the ranch was the only source of community income. At best, the record merely reflects that some of the community income was deposited in the Security State Bank. This does not negate the existence of other community funds, nor does it constitute a tracing of the $4,950.00 received by testator on or about August 30, 1958, into the $4,772.88 payment made by him on September 8, 1958.

■ We conclude, then, that the trial court erred in holding that the $4,000.00 down payment was traced to and connected with the separate funds of testator; that the trial court erred in holding that $1,500.00 of the $1,735.95 payment of August 2, 1957, was traceable to testator's separate funds; and that the trial court did not err in refusing to find that the $4,772.88 payment made on September 8, 1958, had its source in testator's separate funds. Since the defendants do not contend that the final payment of $1,000.00 made on December 1, 1961, was made out of testator's separate funds, it follows that the correct judgment is one decreeing the ranch to be the community property of testator and plaintiff, and impressing against such ranch, in favor of testator's separate estate, a lien in the sum of $10,009.95, representing the payment of December 21, 1959, admittedly made out of testator's separate funds.

The only remaining question is that raised by defendants' challenge to the trial court's finding that, at the time of testator's death, the Frio County ranch was the homestead of plaintiff and testator.

There is no question that until May, 1963, testator lived on the ranch and that such ranch was their homestead. In May, 1963, testator, who was in need of medical attention, moved to Austin. Some time in July, 1963, testator moved into a residence at 5200 Riverside Drive, one of several pieces of property which he had purchased in Austin. Plaintiff remained at the ranch until some time in July, 1963, when, taking most of the household furniture with her, she moved to Austin to "help out." Testator was being treated by doctors in Austin where, on August 23, 1963, he died at Brackenridge Hospital.

■ The only question we need determine is whether the court erred in not finding that the ranch was abandoned as the family homestead prior to testator's death. Where a homestead claimant moves from property which has been previously impressed with the homestead character,

the question of whether such property constitutes a homestead is dependent primarily on the intention of the claimant. McMillan v. Warner, 38 Tex. 410, 411 (1873). As defendants point out, the relevant intention here is that of testator, as head of the family. 28 Tex.Jur.2d, Homestead, § 130, p. 538. Defendants, the parties relying on abandonment of the ranch homestead, had the burden of showing that testator moved from the ranch with the intention of not returning to the property. M. H. Lauchheimer & Sons v. Saunders, 97 Tex. 137, 76 S.W. 750 (1903); Morris v. Porter, 393 S.W.2d 385 (Tex.Civ.App.—Houston 1965, writ ref'd n. r. e.). The evidence relied on as establishing abandonment of a homestead must make it "undeniably clear" that there has been "a total abandonment with an intention not to return and claim the exemption." Gouhenant v. Cockrell, 20 Tex. 96, 98 (1857). See also Burkhardt v. Lieberman, 138 Tex. 409, 159 S.W.2d 847, 852 (1942).

Defendants, in addition to the physical removal of testator from the ranch, rely on the following facts as establishing an abandonment of the Frio County homestead: (1) While in Austin, testator listed the ranch for sale with real estate agents. (2) On July 17, 1963, testator, joined by plaintiff, executed an instrument leasing the ranch for a period of one year to Lyle Hibdon, who "was taking care of the cows" at the ranch. (3) In a letter addressed to Hibdon, plaintiff referred to the Austin residence as "home." (4) In his will, executed nine days before his death, testator referred to the Austin residence as the family "homestead."

■ The fact that testator, while living in Austin, listed the ranch for sale is, under the circumstances of this case, of no great import. The record disclosed that for several years prior to 1963 testator had listed the ranch for sale. Yet, during all of that time, testator continuously claimed the ranch as the family homestead. Testator's attempt to sell the ranch, then, was merely a continuation of a course of conduct initiated years before at a time when it is undisputed that he intended to, and did, claim the ranch as his homestead. This being true, the continued listing of the ranch for sale is no evidence of the formation of a new intention to abandon the homestead.

■ Nor is the execution of the lease to Hibdon persuasive. The temporary leasing of a homestead does not constitute abandonment thereof where no other homestead has been acquired. Tex.Const., Art. 16, § 51, Vernon's Ann.St. Further, the record discloses that, after plaintiff had placed the envelope containing the lease instrument in the mailbox of the Austin residence, one of testator's sons, at testator's request, retrieved the envelope and the document was never delivered to the lessee. The ranch was, in fact, never leased to any one for any period of time.

■ In a letter to friends, plaintiff alluded to the fact that, although she had driven to Pearsall and returned to Austin on the same day, she was not too tired when she returned "home." It is apparent that, in using the word "home," plaintiff was referring to the residence in Austin. Defendants, despite their insistence that plaintiff's intention is of no significance in determining the homestead issue, insist that her reference to the Austin residence as "home" establishes the abandonment of the ranch as the family homestead. However, the word "home" has many meanings, and it is not necessarily synonymous with "homestead." A person may refer to his place of abode as "home" even though he merely rents the premises and is not entitled to claim a homestead. Further, as our Supreme Court has said, "The acquiring of a new home is not always the acquiring of a new homestead, and one does not necessarily abandon a homestead by merely moving his home." Rancho Oil Co. v. Powell, 142 Tex. 63, 175 S.W.2d 960, 963 (1943). It is the acquisition of a new homestead, not merely the acquisition of a new home, which operates as an abandonment of homestead rights.

The only evidence of declarations by testator relied on as manifesting an intention to acquire a new homestead is the reference in his will to the Austin property as the family "homestead." A person's declarations as to this state of mind, even when given under oath during the course of a judicial proceeding, are not conclusive on the issue of his intent. Aside from the testamentary declaration, the actions of testator are, at best, ambiguous with reference to his intention. This is not a case where, the purpose of the removal from an established homestead being uncertain or equivocal, we find aid in open and public declarations of the homestead claimant reflecting his intention. Cf. Woolfolk v. Ricketts, 48 Tex. 28, 37 (1877). A person desirous of publicizing his state of mind would show remarkably poor judgment if he limited his advertising activities to the insertion of a phrase or clause in his last will and testament.

The overt actions of testator in moving to Austin are not inconsistent with the retention of the ranch as the family homestead, and his essentially covert declaration in his will of an intent to acquire a new homestead does not raise his conduct to the dignity of behavior which excludes the finding that the ranch retained its homestead character. We conclude that the finding below that the Frio County ranch was, at the time of testator's death, the homestead of plaintiff and testator is not contrary to the weight and preponderance of the evidence.

That portion of the trial court's judgment awarding plaintiff homestead rights in the Frio County ranch is affirmed. The remainder of the judgment, relating to the interests of the parties in such ranch is modified to provide as follows: (1) The Frio County ranch is declared to have been the community property of plaintiff and testator, but a lien is impressed against such property in favor of the separate estate of J. H. West to secure repayment of the amount of $10,009.95, representing separate funds of J. H. West used in paying the deferred portions of the purchase price of such ranch. Said lien is declared to belong to defendants, Lela Pearl Holley, Mary Lee Jones, Velma Nettie Keller and Lorene West, share and share alike. (2) Plaintiff is declared to be the owner of fee simple title to an undivided one-half interest in and to said ranch, with the fee simple title to the remaining undivided one-half interest therein being vested in defendants, Lela Pearl Holley, Mary Lee Jones, Velma Nettie Keller and Lorene West, share and share alike.

As so modified, the judgment of the trial court is affirmed.