**In re Shearn MOODY, Jr., Debtor.**

No. 86–2314.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 13, 1987.

See also, 64 B.R. 594.

Ben Floyd, Bonham, Carrington & Fox, Houston, Tex., for trustee, W. Steve Smith.

Martin Paul Solomon, New York City, David C. Unger, Houston, Tex., for defendant.

Robert C. Maley, Jr., Sheinfeld, Maley & Kay, Houston, Tex., for intervenor, receiver of Empire Life Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### INTRODUCTION

CARL O. BUE, Jr., District Judge.

The case before the Court is one of the most bizarre and complicated Chapter 11 bankruptcy proceedings on record. The instant matter to be addressed in this protracted litigation concerns the extent to which the Debtor Moody may claim the protection that the Texas Constitution affords property determined to be homestead pursuant to Texas law.

Moody initially filed for bankruptcy under Chapter 13 of the Bankruptcy Code in the Southern District of Texas. The case was dismissed, and Moody thereafter re-

filed a Chapter 13 petition in North Carolina. The case was subsequently converted to a Chapter 11 proceeding. Prior to filing under Chapter 11 in North Carolina, Moody attempted to designate approximately two hundred acres of real property in Galveston, Texas, as his rural homestead in accordance with the Texas Constitution, thereby insulating the land from the claims of creditors. Subsequent to Moody's Chapter 11 filing, the current Receiver of Empire Life Insurance Company of America (hereafter, the "Receiver" and "Empire") filed an objection to Moody's homestead designation. The Chapter 11 Trustee, W. Steve Smith (hereafter the "Trustee"), adopted the objection of Empire to Moody's claimed homestead. Venue in the Chapter 11 case was transferred to the Southern District of Texas on January 1985. Due to the existence of rampant fraud and the bankruptcy judge's lack of contempt power under existing law, the Honorable Letitia Z. Taitte Clark recommended in June of 1986 that reference in the entire Chapter 11 bankruptcy proceeding and its related adversary proceedings be withdrawn to the District Court, a procedural step which was accomplished immediately thereafter.

On May 14, 1987 through May 20, 1987, the present lawsuit was tried on the merits to the Court. The current objection to Moody's claimed homestead exemption is integrally related to the Trustee's complaint in Civil Action No. H–86–3947 in which the Trustee and the Receiver sought unsuccessfully to set aside transfers of the subject property as voidable fraudulent conveyances under the bankruptcy code. Basically the same facts were presented and stipulated to by all parties to the Court in both matters. These stipulated facts present a highly irregular and curiously entangled series of land transactions involving the debtor and various related entities. As in Civil Action No. H–86–3947, the Court has adopted the stipulation presented by the parties and entered further Findings of Fact commencing with finding number 41. Based on the record of the trial of this cause, the Court holds that despite the wholesale indicia of fraud in order to preserve assets, the Defendant Moody is entitled to a homestead under Texas law, that such homestead is rural in character, but that it is limited pursuant to statute to one hundred acres.

### Findings of Fact

1. To the extent that any of the Findings of Fact that follow are considered to be Conclusions of Law, they are hereby adopted as such.

2. Shearn Moody, Jr. Debtor (hereafter Debtor or Moody) is an unmarried adult. (Admission of Fact No. 1.)

3. At all times material hereto, Debtor was the sole shareholder of the Shearn Moody Holding Corporation ("SMHC"). Accordingly, all of the shares of stock of SMHC were property of Debtor's bankruptcy estate. (Admission of Fact No. 2.)

4. At all times material hereto, Debtor was also an officer and director of SMHC. (Admission of Fact No. 3.).

5. The approximately 575 acre tract of land located at 2601 Eight Mile Road in the City of Galveston, Galveston County, Texas, and depicted on Plaintiff's Exhibit 51A is referred to as the subject tract (T, 5/14/87, p. 31, 1. 8–10)[1] The subject tract is generally described in Findings of Fact number 10 and 11.

6. Prior to the incorporation of SMHC, the Debtor acquired the subject tract in three, or possibly four, separate transactions. (Admission of Fact No. 4.) The Debtor acquired the bulk of the subject tract from Robert I. Cohen, Inc. by Deed dated and recorded May 6, 1960 (Plaintiff's Exhibit 1). This transaction was partly for cash and partly financed by Trust 42A for the Debtor's benefit. In May of 1972, when the Debtor became of age pursuant to the terms of Trust 42A, each of three trustees executed warranty deeds conveying the tract of land acquired from Robert I. Cohen, Inc. to the Debtor (Plaintiff's Exhibits 9, 10 and 11). The Debtor ac-

---

1. "T" refers to Transcript
   "p." refers to page number

"1." refers to line number

quired another portion of the subject tract from B. Wittjen and Gaddis Wittjen by Deed dated July 21, 1967 (Plaintiff's Exhibit 7). The Debtor acquired another portion of the subject tract from National Western Life Insurance Company ("National Western") after the Debtor paid off an investment made by the Debtor and others upon the default of the other investors. This was accomplished by Deed dated December 29, 1969 (Exhibits 2, 3, 4, 5 and 6). Finally, the Debtor acquired a portion of the subject tract from Robert I. Cohen's aunt, Mrs. Gladys Blum. Joe Max Taylor obtained the property from Mrs. Blum, and subsequently deeded it to the Debtor on April 24, 1970 (Plaintiff's Exhibit 8).

7. In 1972, the Debtor's privately chartered bank, W.L. Moody (Unincorporated) & Co. Bankers, was placed in receivership by the Securities and Exchange Commission. Members of the Debtor's family advanced funds necessary to pay off the depositors. To secure these advances, the Debtor gave a mortgage on the entire subject tract of land to these members of his family (Plaintiff's Exhibit 12). As the assets of the bank were liquidated, the monies advanced to pay off the depositors were repaid to these members of Debtor's family. (Admission of Fact No. 5.).

8. On January 5, 1973, SMHC was incorporated by the Debtor's brother, Robert L. Moody, acting pursuant to a Power of Attorney granted to him by the Debtor during the Debtor's illness. (Admission of Fact No. 6.).

9. Part of the capitalization of SMHC came from assets remaining after the dissolution of another one of Debtor's life insurance companies, Empire State Life Insurance Company (not to be confused with Empire Life, a distinct entity). The policies of insurance of Empire State Life Insurance Company were reinsured by a life insurance company belonging to Robert L. Moody, known as National Western. The remaining assets after dissolution were transferred to SMHC. Among the assets transferred were three-fifths (⅗ths) of one eighth (⅛th) life estate interest in the Lib-

by Shearn Moody Trust ("Trust 57"). (Admission of Fact No. 7.)

10. On August 1, 1973, there remained due and owing to the Debtor's family members the sum of Nine Hundred Twenty-three Thousand, Seven Hundred Thirteen and ⁷⁵/₁₀₀ Dollars ($923,713.75). On that date, Debtor executed a promissory note made payable to National Western in that amount for a loan which was used to pay off the Debtor's family members (Plaintiff's Exhibit 47). To secure this transaction, the Debtor executed a deed of trust in favor of National Western (the "mortgage to National Western" or the "National Western Mortgage") on the following described approximately 565 acre portion of the subject tract (Plaintiff's Exhibit 17):

TRACT NO. 1:

Lots 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 25, 26, 27, 28, 29, 32, 33, 34, 35, 36, 45 and 46 in Section No. 2, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas, and Lots 93, 437, 446, 447, 454, 455, 456, 457, 466, 467, 468, 469, 474, 475, 476, 477, 481, 486, 487, 489, 494, 495, 496 and 497 in Section No. 1, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

That portion of all unopened and previously dedicated County roadways which have heretofore, by appropriate action of the County Court of Galveston County, Texas, been abandoned, which lie between or which are contiguous to the losts in Section No. 1 and No. 2, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

TRACT NO. 2:

Lot 473 and the South 1515.13 feet of the West 230 feet of Lot 470, Section 1, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

TRACT NO. 3:

The East one-half (½) of Lot 389 and the North 493.9 feet of the West 245 feet of Lot 374, Section 1, Trimble & Lindsey Survey at Galveston Island, Galveston County, Texas.

TRACT NO. 4:

The surface only of Lots 114 and 115 in Section 2, Trimble & Lindsey survey of Galveston Island, Galveston County, Texas. (Admission of Fact No. 8.)

11. The Debtor excepted from the mortgage to National Western a ten acre parcel of the subject tract, generally described as a tract of land located in Lots 36, 25, 16, and 5, in Section 2, and Lots 497, 496, 486 and 487 in Section 1 in the Trimble and Lindsey Survey of Galveston Island, Galveston County, Texas (the "ten acre tract"). (Admission of Fact No. 9.).

12. The loan from National Western was guaranteed by SMHC (Plaintiff's Exhibit 16). To further secure the loan from National Western, SMHC collaterally assigned a life insurance policy on the Debtor's life (Plaintiff's Exhibit 15) and a one-fifth (1/5th) of one-eighth (1/8th) life estate interest in Trust 57 (Plaintiff's Exhibit 18). (Admission of Fact No. 10.).

13. Pursuant to agreements by and between National Western, SMHC, the Debtor and Moody National Bank as Trustee of Trust 57 (Plaintiff's Exhibits 14–19), the semiannual distribution attributable to this assigned life estate interest was forwarded directly to National Western. National Western would in turn pay the semiannual installment due on the loan, any premium due on the life insurance policy and all ad valorem taxes on the entire subject tract. The net proceeds remaining after such payments were remitted by National Western to SMHC and distributed to the Debtor in the form of dividends. (Admission of Fact No. 11.)

14. At all times material hereto, all payments on the mortgage to National Western and ad valorem taxes on the entire subject tract were paid in the manner set forth in Finding of Fact No. 13. (Admissions of Fact Nos. 12 and 41.)

15. Also in 1972, the Receiver and others filed a securities suit against the Debtor in the United States District Court for the Northern District of Texas. At all times material hereto, this litigation was pending before the United States District Court for the Northern District of Texas, the Fifth Circuit Court of Appeals and/or the United States Supreme Court. (Admission of Fact No. 15.)

16. The Receiver obtained a multi-million dollar jury verdict on December 30, 1976, in the District Court in the Northern District of Texas. (Admission of Fact No. 14.)

17. Thereafter, on January 24, 1977, the Debtor conveyed the 565 acres of land described in the National Western Mortgage to SMHC by an Assumption Deed (the "1977 Assumption Deed") (Plaintiff's Exhibit 22). (Admission of Fact No. 15.)

18. Additionally, on September 7, 1977, the Debtor, in his capacity as President and sole shareholder of SMHC, mortgaged the entire subject tract to TEAC Finance Consortium in order to secure a six million dollar line of credit that was to be established (Plaintiff's Exhibits 23–27). Although no funds were extended under the line of credit, the mortgage has not been released, and Debtor never made demand upon TEAC to release the mortgage. (Admission of Fact No. 16.)

19. On January 4, 1979, the Debtor executed and recorded a Designation of Homestead covering 199.56 acres of the subject tract (the "first homestead designation") (Plaintiff's Exhibit 30). The first homestead designation included the one hundred acre tract hereinafter described in Finding of Fact No. 31. (Admission of Fact No. 18.)

20. On May 29, 1979, the Receiver obtained the entry of a judgment in the amount of $6,319,000.00 against the debtor (Plaintiff's Exhibit 43). (Admission of Fact No. 17.)

21. On June 27, 1979, the Debtor executed a Designation of Homestead covering one hundred acres of the subject tract, more or less, which was recorded on June 28, 1979 (the "second homestead designation") (Plaintiff's Exhibit 29). The second homestead designation included the ten acre tract. The second homestead designation states on its face that it was to be effective only if the first homestead designation was ineffective. (Admission of Fact No. 19.)

22. The Debtor filed various post-judgment motions in the Receiver's suit which were ultimately overruled on January 9, 1980. The Debtor then filed his notice of appeal of the Receiver's judgment on February 6, 1980. (Admission of Fact No. 20.)

23. Subsequent to the entry of the Receiver's Judgment, the Debtor made a number of transfers to one James A. Stoker. (Admission of Fact No. 21.)

24. The Debtor executed a Warranty Deed of Gift to Mr. Stoker consisting on an undivided one-half (½) interest in the ten acre tract (Plaintiff's Exhibit 36). The Warranty Deed of Gift states on its face that it was executed on October 10, 1979; however it was not recorded until January 25, 1980, 14 days after Debtor's post-judgment motions referenced above were overruled on January 9, 1980. (Admission of Fact No. 22.)

25. The Debtor executed an Agreement Creating Right of Survivorship in Joint Tenancy Property in favor of Mr. Stoker on October 10, 1979, with reference to the ten acre tract which was not recorded until January 25, 1980, 14 days after the post-judgment motions were overruled on January 9, 1980 (Plaintiff's Exhibit 31). (Admission of Fact No. 23.)

26. On April 1, 1980, the Debtor executed a Deed of Gift—Life Estate granting Mr. Stoker a life estate in the Debtor's remaining undivided one-half (½) interest in the ten acre tract which was recorded on August 11, 1980 (Plaintiff's Exhibit 37). (Admission of Fact No. 24.)

27. Both the October 10, 1980, Warranty Deed of Gift and the April 1, 1980 Deed of Gift—Life Estate were subject to conditions subsequent which had not occurred as of November 14, 1983. (Admission of Fact No. 25.)

28. On April 1, 1980, James A. Stoker executed a Designation of Rural Homestead covering the ten acre tract which was recorded on August 11, 1980 (Plaintiff's Exhibit 34).

29. Also on April 1, 1980, the Debtor executed a Declaration of Trust conveying the ten acre tract into a trust (Plaintiff's Exhibit 33). The Trust was not to be effective unless James A. Stoker predeceased the Debtor. An instrument attempting to revoke the trust was executed by the Debtor on May 13, 1983 (Plaintiff's Exhibit 45). However, the revocation was not recorded until after the filing of the Debtor's initial Chapter 13 case in the Southern District of Texas. (Admission of Fact No. 27.)

30. Also on April 1, 1980, the Debtor executed a Warranty Deed conveying to Shearn Moody, Jr., Trustee, all oil, gas, and other minerals, and mineral interests, and all royalty interests, which Debtor then owned in any land situated in Galveston County, Texas (Plaintiff's Exhibit 32). (Admission of Fact No. 28.)

31. On March 18, 1982, the Debtor executed another assumption deed to SMHC (the "1982 Assumption Deed"), whereby the 565 acre tract previously conveyed by the 1977 Assumption Deed was again conveyed and/or reconveyed to SMHC, this time less one hundred acres, as opposed to the previous reservation of the ten acre tract. The one hundred acres that was reserved is the same property described in the second homestead designation. (Admission of Fact No. 29.)

32. On March 7, 1983, the Debtor, in his capacity as President and sole shareholder of SMHC, executed a Warranty Deed, conveying two hundred acres from SMHC to himself (the "1983 Warranty Deed"). The two hundred acres of the subject tract conveyed by SMHC to Debtor under the 1983 Warranty Deed included most, but not all, of the property described in the first homestead designation, some of which remained titled in SMHC. (Admission of Fact No. 30.)

33. On the dates of the execution and recordation of the 1932 Assumption Deed and the 1983 Warranty Deed, Debtor gave no consideration to SMHC in exchange for the transfers effected by the 1982 Assumption Deed and the 1983 Warranty Deed. (Admission of Fact No. 31.)

34. On March 25, 1983, the Debtor executed a Designation of Homestead (Plaintiff's Exhibit 42) covering the two hundred acres described in the 1983 Warranty Deed

which was recorded on March 29, 1983, under Clerk's File Number 8310617 (the "third homestead designation"). (Admission of Fact No. 34.)

35. Thereafter, debtor executed another Warranty Deed (Plaintiff's Exhibit 41) conveying the two hundred acres described in the 1983 Warranty Deed to Shearn Moody, Jr., Trustee, which was recorded on March 29, 1983, under Clerk's File Number 8310618. (Admission of Fact No. 35.)

36. On April 1, 1983, Debtor executed another Warranty Deed (Plaintiff's Exhibit 43) conveying all oil, gas, or other minerals, or any mineral estate which he then owned, or might own in Galveston County, Texas to Shearn Moody, Jr., Trustee, which was recorded on April 11, 1983. (Admission of Fact No. 36.)

37. On May 13, 1983, the Debtor executed another Warranty Deed (Plaintiff's Exhibit 44) conveying all the minerals owned by the Debtor in, on, or under the two hundred acres described in the 1983 Warranty Deed to Shearn Moody, Jr., Trustee, which was recorded on June 28, 1983, after the Debtor's initial Chapter 13 filing in the Southern District of Texas. (Admission of Fact No. 37.)

38. On June 6, 1983, the Debtor filed his initial voluntary petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas-Houston Division. (Admission of Fact No. 38.)

39. The Debtor dismissed his initial Chapter 13 case on November 10, 1983, and refiled another Chapter 13 case on November 14, 1983, in the United States Bankruptcy Court for the Middle District of North Carolina. It is this second Chapter 13 case which, after conversion to Chapter 11, change of venue and withdrawal of reference, currently pends before this Court as Civil Action No. H-86-2314. (Admission of Fact No. 39.)

40. Debtor's second Chapter 13 petition reflected that, on November 14, 1983, Debtor resided at 3525 Mayfair, Apt. 207, Durham, North Carolina 27707 (Plaintiff's Exhibit 49). (Admission of Fact No. 40.)

41. At the time of filing of the second Chapter 13 petition, the Debtor lived in an apartment at 3525 Mayfair, Durham, North Carolina. (T. 5/14/87)

42. Moody resided in North Carolina while undergoing extensive treatment for high blood pressure at the Kempner Clinic (Moody's testimony, C.A. H-86-3947)

43. At the time of the filing of the second Chapter 13 petition, the Debtor was a resident of North Carolina or had a residence in the Middle District of North Carolina for a longer portion of the preceding 180 days than in any other district (T 5/14/87)

44. The Debtor temporarily resided at the Hotel Washington in 1986. (T. 5/19/87)

45. The Debtor spent intermittent periods of time at the Kempner Clinic at Duke University in Durham, North Carolina, from 1972 to the present. (T. 5/19/87)

46. The Debtor has also spent time at the premises of his mother located at 16 Cedar Lawn South, Galveston, Texas. (T. 5/19/87)

47. The Debtor has claimed neither the Washington Hotel nor the Cedar Lawn South premises as his principal home or domicile. (T. 5/19/87)

48. The Debtor claims the subject tract at 2601 Eight Mile Road as his domicile and homestead.

49. When the Debtor filed his second Chapter 13 petition in November 1983, the Debtor asserted that his "principal business" was dealing with his health problems which include high blood pressure. (T. 5/14/87)

50. Cattle are located on the subject tract and have been there since the 1800's. (T. 5/14/87)

51. The Debtor is entitled to favorable real estate tax treatment due to the presence of cattle. (T. 5/14/87)

52. The prior owners of the property had cattle on the land. (T. 5/14/87)

53. The property was originally known as the Kauffman Dairy Farm. (T. 5/14/87)

54. Much of Galveston Island historically has been used for cattle grazing and dairy farming. (T. 5/14/87)

55. The property owner directly to the south of the subject tract uses the land for cattle grazing and leasing horses. (T. 5/14/87)

56. The subject tract is located within the city limits of the City of Galveston, Texas, and was located within the city limits of the City of Galveston in November 1983. (T. 5/14/87)

57. The operative date for the purpose of determining whether the land is of rural or urban character is November 14, 1983, the date the debtor originally sought relief under the Bankruptcy Code in North Carolina. *In the Matter of Williamson,* 804 F.2d 1355 (5th Cir.1986). (Debtor's eligibility for homestead exemptions determined as of date of original Chapter 11 filing, and not as of date bankruptcy case was converted to case under Chapter 7.)

58. The subject tract was annexed by the City of Galveston in 1977 as a result of land wars between the City of Hitchcock, the City of LaMarque, Texas City, and the City of Galveston. (T. 5/19/87)

59. The City of Galveston has twenty one zoning districts, none of which include agricultural districts regardless of the fact that much of the land west of the subject tract is undeveloped grazing land.

60. Prior to the time that the Debtor purchased the subject tract, the owner platted it for single dwelling homes. (T. 5/14/87)

61. No commercial or residential development has taken place on the subject tract since the debtor acquired it.

62. Of the lots in the subject tract, approximately seven lots are zoned "PD," planned development. A planned development district is one in which the owner or developer can submit a plan to the Galveston City Zoning Board for approval. A "PD" district is a generalized designation, the purpose of which is to leave the designation open. (T. 5/15/87)

63. With the exception of Jamaica Beach and several minor designated areas, the City of Galveston runs twenty-five miles west of the subject tract on Eight Mile road. (T. 5/15/87)

64. The land to the west of Eight Mile Road is primarily uninhabited and undeveloped, although there is some light industrial development on Stewart Road. (T. 5/15/87)

65. The entire area within the city limits of Galveston is covered by one of the twenty one zoning districts. (T. 5/15/87)

66. Horses and cattle were observed by the Trustee's expert on the westerly portion of Galveston Island. (T. 5/15/87)

67. Neither gas lines nor sewer lines run directly to the subject tract. (T. 5/15/87)

68. A body of water known as Sweetwater Lake divides the subject tract, essentially forming a natural barrier on Galveston Island.

69. According to the Debtor, the population of Galveston Island historically has been located behind the seawall (T. 5/19/87)

70. The subject tract is not located behind the seawall, and the last extension of the seawall was in the 1950's. (T. 5/19/87, Defendant's Exhibit 4)

71. Part of the subject tract is zoned "NS," neighborhood services. Eight lots are zoned "1F3," a single family residence category which includes townhomes. The bulk of the subject tract is zoned "1F1" for single family town homes. (T. 5/20/88)

72. The neighborhood surrounding the subject tract has multi-purpose zoning, including multi-family, retail, and light industrial use. However, the zoning designations do not conform to the actual use of the property.

73. There are only three residences located on the easterly side of Eight Mile Road, the Elbert House at the northeast corner of Eight Mile Road and Stewart Road, the Moody home and the Bettencourt residence on the subject tract. (T. 5/15/87).

74. The Elbert home is listed on the 1986 tax rolls as located at Route 3, Box 80, Galveston, a rural address. (Defendant's Exhibit 11)

75. The 1986 tax roll indicates that the Elbert property is designated as unimproved grazing land for tax purposes. (Defendant's Exhibit 11)

76. The subject tract is also listed as unimproved grazing land and open space for tax purposes on the 1986 tax roll. (Defendant's Exhibit 11)

77. The physical characteristics of the subject land have remained essentially the same since November 14, 1983, the operative date for determination of Moody's entitlement to a homestead exemption. Therefore, the 1986 tax roll is probative evidence of the character of the subject tract and surrounding area in 1983.

78. For the tax years 1975–1983, the Debtor's federal income tax returns demonstrated that ranching operations on the subject tract resulted in large financial losses, thereby enabling the debtor to benefit from favorable tax treatment. (T. 5/15/87)

79. The lack of profitability of ranch operations conducted on the land clearly does not alter the physical character of the land.

80. Water from the City of Galveston is available on the subject tract. (T. 5/14/87)

81. A sewer line approximately 18 to 27 inches wide runs along Stewart Road. Although the existence of the sewer line infers future construction of higher density residences or businesses, the sewer line was not constructed on November 14, 1983.

82. Fire and police protection were available to the subject tract in November, 1983.

83. Midrise condominiums are located on the beach beyond the end of the seawall, south of Highway 3005. (T. 5/15/87, Defendant's Exhibit 4)

84. The Campeche Bay subdivision is located to the southeast of Sweetwater Lake. The subdivision was in existence in November, 1983.

85. Townhomes are located to the north of Stewart Road and to the east of Sweetwater Lake and were constructed some time during 1982 or 1983 (T. 5/15/87)

86. On the south side of Stewart Road, there is a multi-story apartment complex which was in existence in November, 1983. (T. 5/15/87)

87. At the northern end of Eight Mile road are recreational type single family residences (T. 5/26/87)

88. Between 1981 and 1984, a major construction boom took place on Galveston Island, primarily west of Six Mile Road, between Six and Seven Mile Road. (T. 5/15/87)

89. The area of Eight Mile Road between Stewart Road and FM 3005 contains single family residential buildings (T. 5/15/87)

90. The houses referred to in Finding of Fact 89 are recreational beach homes built on supports or stilts. (T. 5/19/87)

91. The traffic count on Seawall Boulevard also known as FM 3005 which runs along the southerly side of Galveston Island south of the subject tract averaged over 5000 cars per day in 1983.

92. Stewart Road which gives access to the subject tract is a country road without curbs and sidewalks (T. 5/15/87)

93. Although FM 3005 may have a traffic count comparable to many streets in the City of Houston, the geographic makeup of Galveston Island demonstrates that FM 3005 is basically a highway leading to beach and recreational areas, including a bridge approximately thirty miles west of the subject tract.

94. Traffic on Eight Mile Road in front of the subject tract is extremely light.

95. Neither of the two experts who testified as to the character of the subject tract was particularly helpful. Mr. Hewitt was generally unable to credibly support his assertions and had not thoroughly examined the area in question. Mr. Vidrine who testified as a friend on behalf of the

Debtor had a degree in soil chemistry and had been employed as a teacher of agriculture, as a geophysicist, and as an exploration manager. He is currently an oil and gas consultant.

96. Although Vidrine had only been on the subject tract for the first time in 1984, he was generally familiar with the topography of Galveston Island.

97. The subject tract is comprised of a series of highlands and lowlands which form finger-like ridges. (T. 5/15/87)

98. The lowlands on the subject tract are included in a survey of wetlands by the Department of the Interior. (T. 5/15/87, Defendant's Exhibits 6, 7 and 8)

99. A great part of the subject tract is wetland and extremely difficult to develop for commercial or residential use. (T. 5/15/87)

100. FM 3005 was constructed approximately seven or eight years ago and has double lanes. (T. 5/15/87)

101. Prior to the construction of FM 3005, Stewart Road and a road constructed of shell provided access to the western portion of Galveston Island. (T. 5/15/87)

102. The area north of Sweetwater Lake on the subject tract is inhabited by water moccasins, nutrea and other life forms and is extremely difficult to develop for land use. (T. 5/15/87)

103. There have been no major improvements on Stewart Road since Moody purchased the subject tract in 1961. No homes have been built along Stewart Road since his purchase, nor is the road well maintained.

104. The land to the west of Sweetwater Lake is substantially the same as the land on the subject tract, encompassing wide open spaces and pasture land. It is primarily wetland, which is suitable for grazing. (T. 5/19/87)

105. To the east of Seven Mile Road there is a considerable amount of development including subdivisions and an airport. (T. 5/19/87)

106. In the area to the west of Sweetwater Lake there is little residential development.

107. In 1983, commercial development on Galveston Island was taking place to the east of the subject tract.

108. By November 14, 1983, the subject tract still retained a rural character.

109. As of November 14, 1983, the subject tract is properly characterized as undeveloped rural land.

110. When Moody moved into the home on the subject tract in 1965, he intended to make the property his homestead. (T. 5/19/87)

111. Since 1965 Moody has claimed no other property as his Texas homestead (T. 5/19/87)

112. Although Moody temporarily resided at the Hotel Washington, his mother's residence and an apartment in North Carolina, he had no intention of abandoning his homestead rights in the subject tract. (T. 5/19/87)

113. Goats, horses and cattle are located on the subject tract. (T. 5/19/87)

114. When Moody conveyed and attempted to reconvey certain acreage to the Shearn Moody Holding Company (SMHC) in 1977 and 1982, he intended to retain his homestead rights in the subject land.

115. Moody remained in possession of the subject tract in 1983, although SMHC is listed on the 1986 tax rolls as holding title to the portion which Moody attempted to designate as his homestead. (T. 5/19/87, Defendant's Exhibit 11)

116. The home and its adjoining tracts have consistently been used for homestead purposes since 1965.

117. Any purported conveyances to SMHC are void, without consideration and ineffective to demonstrate alienation of Moody's homestead rights in the subject tract.

118. Irrespective of any fraudulent intent Moody may have had, the conveyances of property designated as homestead to

SMHC are not fraudulent as to Moody's creditors and are therefore ineffective transfers of homestead property.

119. At no time did Moody relinquish or abandon his homestead rights in the subject tract.

120. Similarly, the conveyances of ten acres of property to Stoker are void, ineffective and without consideration.

121. The Stoker deeds are attempts by Moody to shield the land from creditors and to maintain at the same time his homestead interest in the land.

122. The deeds to Stoker recited that they were subject to conditions subsequent that had not occurred on November 14, 1983. Therefore, any purported conveyance of title to property on which Moody could claim homestead rights was void and ineffective.

123. At no time did Stoker ever attempt to assert that Moody no longer had the homestead right to reside in the residence on the subject tract.

124. The conveyances to SMHC and Stoker are not pretended sales. No evidence was presented that Moody attempted to mortgage or encumber property for the purpose of obtaining money, thereby rendering the conveyances pretended sales.

125. Although the above conveyances are not pretended sales, they are void, ineffective, convey no homestead rights, and may not be deemed to be in fraud of creditors under Texas law.

126. The purported transfer of homestead property to Shearn Moody Jr., Trustee, is also a void attempt to transfer homestead property into a trust for the purpose of protecting the land from execution by creditors.

127. Because Moody has neither alienated nor abandoned his homestead rights, he is entitled to claim one hundred acres of land as his rural homestead under existing Texas law. The second homestead designation is therefore the operative instrument establishing Moody's exemption.

## CONCLUSIONS OF LAW

### THE TEXAS HOMESTEAD EXEMPTION

1. The Texas homestead exemption has historically commanded unusual deference. Protection of homestead rights has consistently been a fundamental policy of Texas law. *Commonwealth National Bank v. United States,* 573 F.Supp. 881 (N.D.Tex. 1983).

2. The respect afforded a Texas homestead is so great that under Texas law, the homestead right constitutes an estate in land rather than a mere privilege of exemption or possession. *Andrews v. Security Nat. Bank of Wichita Falls,* 121 Tex. 409, 50 S.W.2d 253 (1932), *Sakowitz Bros v. McCord,* 162 S.W.2d 437 (Tex.Civ.App.—Galveston, 1942, no writ).

3. Pursuant to the Bankruptcy Code, Title 11 U.S.C. § 522b(2)(A) provides in part that a debtor may exempt from property of the bankruptcy estate property exempt under state or local law that is applicable on the date of filing of the petition at the place in which the Debtor's domicile has been located for the 180 days immediately preceding the date of the filing. Although Moody filed his Chapter 13 petition in North Carolina, he was only residing temporarily in North Carolina. At all times material Moody was a Texas domiciliary and was entitled to invoke Texas' exemption statutes. *In re Bubert,* 61 B.R. 362 (W.D.Tex.1986), affirmed, 809 F.2d 259 (5th Cir.1987) (Debtor may claim "exemptions" under federal statutory scheme or choose "exemptions" as they are granted by the laws of the Debtor's home state): *In re Wellerg,* 12 B.R. 48 (Bankr.E.D.Va.1981) (Definition of domicile for the purpose of determining exemptions is determined by law of forum.)

4. Bankruptcy courts must resort to state law for an interpretation of state exemption rights in homesteads. *In re Barnhart* 47 B.R. 277 (Bankr.N.D.Tex. 1985). Under Texas law land claimed as homestead is exempt from execution by judgment creditors, and a debtor may convey homestead property free and clear of judgment liens. *Englander v. Kennedy,*

424 S.W.2d 305 (Tex.Civ.App.—Dallas 1968, writ ref'd. n.r.e.)[2]

5. Article XVI, Section 51 of the Texas Constitution provides that:

The homestead not in a town or city, shall consist of not more than 200 acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village shall consist of a lot or lots amounting to no more than one acre of land, together with any improvements on the land; provided that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired.

The Texas Property Code further clarifies the definition of a Texas Homestead. Section 41.002 provides:

(a) If used for the purposes of an urban home or as a place to exercise a calling or business in the same urban area, the homestead of a family or a single, adult person, not otherwise entitled to a homestead, shall consist of not more than one acre of land which may be in one or more lots, together with any improvements thereon.

(b) If used for the purposes of a rural home, the homestead shall consist of:

(1) for a family, not more than 200 acres, which may be in one or more parcels, with the improvements thereon; or

(2) for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon.

(c) The definition of a homestead as provided in this section applies to all homesteads in this state whenever created.

6. Ordinarily, whether homestead land has rural or urban character is a question of fact unless the facts and circumstances are such that reasonable minds cannot differ. *Aetna Ins. Co. v. Ford*, 417 S.W.2d 448 (Tex.Civ.App.—Eastland 1967), rev'd. on other grounds, 424 S.W.2d 612 (Tex. 1968), *First State Bank of Grapeland v. Brown*, 490 S.W.2d 248 (Tex.Civ.App.—Tyler 1973, no writ); *Kimmey v. Goodrum*, 346 S.W.2d 901 (Tex.Civ.App.—Waco 1961, writ ref. n.r.e.).

7. In order to establish homestead rights, the proof must show a combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as homestead. *Sims v. Beeson* 545 S.W.2d 262, 263 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.); *Prince v. North State Bank*, 484 S.W.2d 405, 409 (Tex.Civ. App.—Amarillo 1972, writ ref'd. n.r.e.).

8. Actual use of land as a homestead is the most satisfactory and convincing evidence of intention to put land to homestead use. *Lifemark Corp. v. Merritt*, 655 S.W.2d 310 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd. n.r.e.); *Spence v. Spence*, 455 S.W.2d 365, 368 (Tex.Civ.App. —Houston [14th Dist.] 1970, writ ref'd n.r. e.); *Clark v. Salinas*, 626 S.W.2d 118 (Tex. Civ.App.—Corpus Christi 1981), writ ref'd n.r.e., 628 S.W.2d 51 (Tex.1982).

---

**2.** The homestead rights of Texas citizens are guaranteed by the Texas Constitution, Art. 16 § 50 which provides:

The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon, and in this last case only when the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead; nor may the owner or claim-ant of the property claimed as homestead, if married, sell or abandon the homestead without the consent of the other spouse, given in such manner as may be prescribed by law. No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided, whether such mortgage, or trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasanance shall be void. This amendment shall become effective upon its adoption.

9. Ordinarily, the initial burden of proving the existence of a homestead is on the homestead claimant. *Burk Royalty Co. v. Riley,* 475 S.W.2d 566 (Tex.1972); *Pace v. McEwen,* 617 S.W.2d 816 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). Once the claimant of homestead protection has established his homestead, the burden shifts to the creditor seeking turnover of the homestead in satisfaction of a judgment to disprove its continued existence. *Lifemark v. Merritt,* supra at 314.

10. The burden amounts to a presumption that the homestead continues to exist until its termination is proved. *Sullivan v. Barnett,* 471 S.W.2d, 39, 43 (Tex.1971).

11. In Texas homestead rights may only be lost through death, abandonment or alienation. *Long Bell Lumber Co. v. Miller,* 240 S.W.2d 405 (Tex.Civ.App.—Amarillo 1951, no writ); *Hollifield v. Hilton,* 515 S.W.2d 717 (Tex.Civ.App.—Ft. Worth 1974, writ ref'd. n.r.e.).

12. The burden of proving abandonment is on the party asserting that the homestead rights have been abandoned. *Sullivan v. Barnett,* supra at 43; *Rancho Oil Co. v. Powell,* 142 Tex. 63, 175 S.W.2d 960 (1943). *Gill v. Quinn,* 613 S.W.2d 324 (Tex.Civ.App.—Eastland 1981, no writ).

13. The evidence relied on to establish abandonment of a homestead must make it undeniably clear that there has been a total abandonment with an intention not to return and claim the exemption. *Burkhardt v. Lieberman,* 138 Tex, 409, 159 S.W.2d 847, 852 (1942); *West v. Austin Nat'l Bank,* 427 S.W.2d 906 (Tex.Civ.App.—San Antonio 1968, writ ref'd. n.r.e.). Mere removal of an owner from the homestead does not show abandonment; abandonment requires both an overt act of discontinued use and the intent to permanently do so. *Gill v. Quinn,* 613 S.W.2d 324 (Tex.Civ.App.—Eastland 1981, no writ); *Hoffman v. Love,* 494 S.W.2d 591 (Tex.Civ.App.—Dallas), writ ref'd. n.r.e. per curiam, 499 S.W.2d 295 (Tex.1973). A temporary departure from the homestead does not constitute abandonment. *McFarland v. Rousseau,* 667 S.W.2d 929, 931 (Tex.App.—1984, no writ).

14. Whether there has been an abandonment of a homestead is generally a question of fact. *R.B. Spencer & Co. v. Green,* 203 S.W.2d 957 (Tex.Civ.App.—El Paso 1947, no writ).

■ 15. The Plaintiffs assert that Moody's actions on several occasions amount to abandonment of Moody's homestead rights. The Trustee and Empire have failed to produce sufficient evidence demonstrating that Moody's sojourns in North Carolina and Washington D.C. constituted complete and total abandonment by Moody with no intention to return to the subject tract. Moody's absence was primarily for health reasons and cannot be considered complete and total abandonment of Moody's homestead rights. *R.B. Spencer & Co. v. Green,* 203 S.W.2d 957 (Tex.Civ.App.—El Paso 1947, no writ).

■ 16. Moody alleges that he is entitled to claim two hundred acres of land located on the subject tract as his rural homestead. The Trustee argues that the land was located within the city limits of Galveston in 1983 and had a predominantly urban character at the time Moody filed his bankruptcy petition, therefore entitling him to one acre of land at most.

17. Under Texas law, no set formula exists to label land as rural or urban. The courts have examined and balanced many factors. Although location of a homestead is a factor, it is not determinative of whether the character of the land is rural or urban. Where a rural homestead right exists in lands adjacent to a town or city, an extension of the corporate lines of the city or town around the land will not destroy the character of the rural homestead. *Laucheimer v. Saunders,* 97 Tex. 137, 76 S.W. 750 (1903); *Wilder v. McConnell,* 91 Tex. 600, 45 S.W. 145 (1898). A rural homestead may be situated entirely or partially within the corporate limits of a city, town or village, and an urban homestead may be located outside of the corporate limits. *Aetna Ins. Co. v. Ford,* 417 S.W.2d 448, (Tex.Civ.App.—Eastland · 1967) rev'd on other grounds, 424 S.W.2d 612 (Tex. 1968).

18. The platting of land does not necessarily change the character of homestead from rural to urban where land is platted after it is included within city limits. *Atkinson v. Phares*, 20 Tex.Civ.App. 150, 49 S.W. 653 (1898, writ denied).

19. Where a homestead is designated as rural before a city's lines are extended beyond it, the rural character is presumed to continue until sufficient evidence is presented to demonstrate that acts had been done by the owner or by the city to change its character from a rural to an urban homestead. *Wilder v. McConnell*, Supra 45 S.W.2d at 147.

20. The character of the land in close proximity to the claimed homestead as well as the occupations of those living in the surrounding areas are probative of a tract's rural or urban characteristics. See, e.g. *Commerce Farm Credit Co. v. Sales*, 288 S.W. 802 (Tex.Comm'n App.1926, holding approved).

21. The use of city services such as fire and water is also probative of the land's character. See e.g. *Commerce Farm Credit Co. v. Sales*, supra at 804.

22. An urban area generally consists of an aggregation of inhabitants and a collection of dwellings and other buildings. *Purdy v. Grove*, 35 S.W.2d 1078 (Tex.Civ.App.—Eastland 1931, writ ref'd.); *Vistron Corp. v. Winstead*, 521 S.W.2d 754 (Tex.Civ.App.—Eastland 1975, no writ).

23. To constitute a rural homestead, the land must be used for a residence and the balance of the tract for the support of the family. *Ratliff v. Smith*, 178 S.W.2d 138, 140 (Tex.Civ.App.—El Paso 1943, writ ref'd); *Vaden v. Collier*, 253 S.W. 889 (Tex.Civ.App.—Fort Worth 1923, no writ) (Rural homestead may be located in separate tracts of land provided one tract is used as a place of residence for a family and the other tracts are used for the purpose of supporting the family.)

24. Although the Trustee argues that the subject tract was not used for rural purposes at the time the Debtor filed his second Chapter 13 petition, the testimony is effectively uncontroverted that a substantial number of cattle were grazing on the land, thereby supporting the Debtor's assertions that the land was used for rural activities. Because the Debtor's financial station in life may not have rendered it necessary for him to derive sole financial support from the land, this fact alone does not convert rural property to urban land. As the Texas Supreme Court noted in *Posey v. Bass*, 77 Tex. 512, 14 S.W. 156 (1890):

It is the place of the homestead that gives character to it, not the business of the head of the family. If it be in the country it is a rural homestead; if it be in a city it is an urban residence.

25. Moody has successfully demonstrated that the subject tract was rural property when he purchased the land with the intent to designate the tract as his homestead in the 1960's. Once the presumption that a rural homestead is established, that presumption continues until rebutted by competent evidence. The Trustee and Intervenor have failed to produce sufficient evidence to demonstrate that on November 14, 1983, the city or Moody as the owner, had taken steps to change the character of the land from rural to urban.

■ 26. Moody, however, is only entitled to claim one hundred acres as his rural homestead exemption. Moody cites Jacobus; *Texas Real Estate Law* (4th Ed.1985) for the proposition that section 41.002 of the Texas Property Code which limits a single person claiming a rural homestead to one hundred acres is an impermissible modification of the Texas Constitution on the basis that later legislation may not restrict or modify the state's constitution. The Court notes, however, that similar exemption statutes distinguishing between single and married people have withstood constitutional muster. *In re Stratham*, 483 F.2d 436 (9th Cir) *cert. denied*, 414 U.S. 1069, 94 S.Ct. 578, 38 L.Ed.2d 474 (1973) (State of Washington's homestead exemptions distinguishing between married and single people did not violate the equal protection clause of the 14th Amendment).

Additionally, well established principles of judicial restraint militate against federal court intervention in state legislation ab-

sent evidence of violations that reach constitutional magnitude. Accordingly, the Court declines the invitation to strike down the challenged provision in the Texas Property Code.

27. The Court concludes that on the operative date, November 14, 1983, the subject tract was rural land for the purpose of the Texas constitutional homestead exemption, thereby entitling Moody as a single person to claim one hundred acres.

### a.
### THE SMHC CONVEYANCES

28. The Trustee and Intervenor attack certain conveyances involving Shearn Moody Holding Company, claiming that Moody extinguished his homestead rights by conveying title to portions of the subject tract to the corporation of which he was President and sole shareholder.

As set forth in the findings of fact, Moody conveyed 565 acres of land described in the National Western Mortgage to SMHC by an assumption deed (the "1977 Assumption Deed"). In March 1982, Moody executed another assumption deed to SMHC whereby the 565–acre tract previously conveyed was "re-conveyed" less one hundred acres described in the second homestead designation. In 1983, as sole shareholder, and President of SMHC, Moody conveyed by warranty deed two hundred acres back to himself, which included most of the property included in the first homestead designation. The parties stipulated that no consideration was given for the transfer effected by the 1982 Assumption Deed and the 1983 warranty deed.

The consideration recited for the 1977 Assumption Deed to SMHC was cancellation of all debts owed by Moody to SMHC and the payment by SMHC of all amounts remaining due on the promissory note executed to National Western Life Insurance Company in 1973. However, the stipulated facts reveal that SMHC had previously collateralized and guaranteed the National Western Mortgage on August 1, 1973. The Court's finding is in accordance with Judge Clark's finding that the conveyances were without any business or rational purpose,

and was done to hide assets from the Receiver.

The Court also concludes that the 1977 Assumption Deed to SMHC was done without consideration and for no valid business purpose. Moody's purpose in executing the 1977 deed to SMHC was to hide assets from his creditors. Moody's attempt to convey homestead property to SMHC was not bonafide because his actions and intentions demonstrate that he intended to maintain a homestead interest in the land. Therefore, the deed is void and cannot be used as a basis to deprive Moody of his homestead rights. Moody at all times intended to claim the subject tract as his homestead and remained in control and possession of the subject tract throughout the paper transactions.

29. The Trustee and Intervenor propound several theories based on corporate ownership of the subject tract to demonstrate abandonment and alienation of the homestead. The Trustee relies on *In re Yamin,* 65 B.R. 938 (Bankr.S.D.Tex.1986) to support his contention that by merely occupying the ranch premises while legal title to the property was held by SMHC, Moody effectively abandoned his homestead interest in the subject tract. A close reading of *Yamin* does not support this conclusion. The bankruptcy court in *Yamin* concluded that where title to residential property was held by a corporation to prevent and defraud personal creditors from obtaining liens against a residence, the debtor had no intent to claim the property as homestead. 65 B.R. at 942.

However, In *Yamin,* the debtor explicitly denied claiming the property as homestead while a mortgagee relied on his representations that the property was not homestead and took a lien on the property. The bankruptcy court held that Yamin had abandoned his homestead rights by executing a deed of trust on the property to the corporation which explicitly denied the debtor any homestead interest in the residence. The Court did give weight to the fact that the debtor misrepresented the character of the property to the detriment of the mortgagee, thereby estopping and precluding

the debtor from asserting a homestead interest in the mortgaged property. 65 Bankr. at 942.

30. The Court is not persuaded that holding title to property in a corporate name alone extinguishes homestead rights by abandonment. The cases cited for this proposition in *Yamin* explicitly deal with bona fide transfers of business homesteads to corporations, accompanied by intent to relinquish homestead rights, a situation clearly not present in this case and of questionable relevance to the facts in *Yamin*. See, e.g. *Eckard v. Citizens Nat. Bank in Abilene*, 588 S.W.2d 861 (Tex.Civ.App.—Eastland 1979 writ ref'd. n.r.e.); *Nowlin v. Wm. Cameron & Co.*, 54 S.W.2d 1035 (Tex. Civ.App.—Fort Worth 1932, writ refused); *Nash v. Conatser*, 410 S.W.2d 512 (Tex.Civ. App.—Dallas 1966, no writ); and *Mayfield v. First State Bank of Holland*, 19 S.W.2d 454 (Tex.Civ.App.—Austin 1929, no writ).

31. Texas law clearly permits the retention of a non-business homestead where title is held by a corporation. *See e.g., McGahey v. Ford*, 563 S.W.2d 857 (Tex.Civ. App.—Fort Worth 1978, writ ref'd. n.r.e.); *Shepler v. Kubena*, 563 S.W.2d 382 (Tex. Civ.App.—Austin 1978, no writ). In addition, Texas law liberally permits homestead rights to exist under a tenancy at will, see *Shepler, supra*, and under permissive occupancy. *Birdwell v. Burleson*, 31 Tex.Civ. App. 31, 72 S.W. 446 (1902, writ ref'd.).

32. Homestead rights may be asserted by a debtor where a conveyance of homestead property is neither bona fide nor marked by an intent to relinquish or abandon the homestead. See e.g. *Hughes v. Parmer*, 164 S.W.2d 576 (Tex.Civ.App.—Austin 1942, no writ)

33. The Trustee argues that a conveyance of realty in fraud of creditors actually passes title to the realty, thereby rendering the property subject to the debts of SMHC. See e.g. *Ransom v. Ransom*, 252 S.W.2d 212 (Tex.Civ.App.—Fort Worth 1952, writ ref'd.); *Letcher v. Letcher*, 421 S.W.2d 162 (Tex.Civ.App.—San Antonio 1967, writ dismissed); *John Hancock Mutual Life Ins. Co. v. Morse*, 132 Tex. 534, 124 S.W.2d 330 (Tex.Comm.App.1939). However, the

Court has already determined in C.A. H-86–3947, 77 B.R. 566, that under Texas law, a bankruptcy trustee and a judgment creditor may not set aside a conveyance of exempt homestead property where the purpose is to place assets beyond the creditor's reach. The practice is not fraudulent as to creditors. As the Fifth Circuit observed citing earlier Texas jurisprudence, Texas constitutional and statutory protection of the homestead is absolute and will be allowed in full regardless of a debtor's intent. *Matter of Reed*, 700 F.2d 986 (5th Cir.1983).

34. The Trustee argues that Moody may not set aside his own fraudulent conveyances. However, because the conveyances of homestead property are not fraudulent as to creditors, the Trustee's standing argument is inapplicable to Moody's situation.

35. Moody argues that the conveyances to SMHC are "pretended sales" under the Texas constitution and are therefore void. A pretended sale, however, involves a conveyance where a mortgage is actually placed on the homestead that would otherwise be invalid under the Texas constitution. A pretended sale is one in which the grantor intends the transaction to be a mortgage, security for a debt owing by the transferor to the transferee. *Hardie & Co. v. Campbell*, 63 Tex. 292 (1885). The existence of a debtor/creditor relationship after the execution of the deed is determinative of whether the conveyance is a mortgage. *Mansfield v. Orange Investment Co.*, 260 S.W. 307 (Tex.Civ.App.—Beaumont 1924, no writ).

36. Moody has failed to demonstrate the existence of a debtor/creditor relationship that brings the conveyances to SMHC within the definition of a pretended sale. However, because the deed to SMHC has already been deemed void, and without any intent to relinquish homestead rights, no title was passed to SMHC by the conveyance. See, e.g., *Sullivan v. Barnett*, 471 S.W.2d 39 (Tex.1971) (Ineffective deed to real estate did not constitute abandonment of homestead rights where grantor remained on land and continued to use it as a

homestead); *Hughes v. Parmer*, 164 S.W.2d 576 (Tex.Civ.App.—Austin 1942, no writ) (Deed of homestead property was void where there was no intent to pass title and grantor remained in possession of property. Conveyance was not fraudulent as to creditors).

37. Having concluded that the 1977 deed, the 1982 Assumption Deed and the 1983 warranty deed were void attempts to convey homestead property, the Court finds that title to the property remained in Moody. Therefore, Moody may claim a one hundred acre rural homestead pursuant to Texas law.

### b.
### THE STOKER CONVEYANCES

38. The Trustee asserts that the deeds to James Stoker conveyed away any homestead rights Moody had in the land. The evidence revealed that in 1979 and 1980 Moody deeded to Stoker his long time friend and companion an undivided half interest in a ten acre tract, a right of survivorship in the ten acre tract and a life estate in the remaining undivided half of the ten acre tract. This tract was not included in the mortgage to National Western or the 1977 conveyance to SMHC. Moody, however, did include the ten acre tract in the first two homestead designations which were executed and recorded.

39. The deed of gift life estate and warranty deed contained conditions subsequent that the parties stipulated had not occurred as of November 14, 1983; specifically, that Stoker would maintain the property as his permanent home and that he would not transfer his interest or the conveyances would not be effective. The purported consideration for the conveyances was love and affection.

40. The transfers to Stoker are clearly a sham and a nullity. Stoker testified that Moody always had the right to use the ranch house as his home. Moody retained the right to remain on the ranch. For all practical purposes, no changes occurred whatsoever as a result of the transfer. The Court concludes that the transfers to Stoker were a misguided attempt to convey homestead property in order to protect it

from Moody's creditors and to permit Moody to retain a homestead. They are therefore ineffective to eliminate Moody's homestead rights in the land.

■ 41. Even assuming that the Stoker deeds are valid conveyances of real property, title to land in fee simple is not required to sustain a claim of homestead. *Villarreal v. Laredo National Bank*, 677 S.W.2d 600 (Tex.App.—San Antonio 1984 no writ); *Gann v. Montgomery*, 210 S.W.2d 255 (Tex.Civ.App.—Fort Worth 1948, writ ref'd. n.r.e.).

42. Under Texas law, a debtor need not have an assignable interest in land to claim a homestead. *Birdwell v. Burleson*, 31 Tex.Civ.App. 31, 72 S.W. 446 (1902, writ refused.) (Possession and use of property enough to sustain rural homestead rights); *Lewis v. Lindsley*, 68 S.W.2d 548 (Tex.Civ.App.—Austin 1934, writ refused) (Where owner of land permitted his brother and family to remain and improve land, homestead rights were acquired by occupant.) Although Texas cases focusing on the homestead are not consistent, those dealing generally with homestead rights among close family members support the proposition that homestead rights may exist in the absence of legal title to land.

43. The Trustee asserts that Moody retained a reversionary interest in the ten acre tract that will not sustain a homestead. A remainder interest or a reversionary interest will not ordinarily sustain a claim of homestead. See *Rettig v. Houston West End Realty Co.*, 254 S.W. 765 (Tex Comm'n App.1923, judg'mt adopted); *Turner v. Miller*, 255 S.W. 237 (Tex.Civ. App.—Amarillo, 1923, no writ). However, on the date Moody's entitlement to a homestead is to be determined, November 14, 1983, the conditions subsequent in the Stoker deed of gift life estate and warranty deed of gift had not yet occurred. Even though the agreement creating right of survivorship in joint tenancy property did not contain explicit conditions it was also premised on the conditions listed in the two deeds. Even assuming the validity of the deeds, Moody retained more than a reversion while remaining in possession of the

land. Moody still had sufficient interest in the land to sustain a homestead exemption.

44. The debtor also argues that the deeds to Stoker were "pretended sales." As the Court noted previously, as to the SMHC conveyances, determination of whether a conveyance constitutes a pretended sale is a question of fact. The debtor produced no evidence whatsoever that the Stoker transaction was based on a debtor/creditor relationship or that the purpose of the deeds was to encumber the ten acre tract with a lien or mortgage. Therefore the conveyances were not pretended sales; rather they were nullities which conveyed no interest in the property.

47. The Court finds that the Stoker transactions did not extinguish Moody's homestead rights.

### Conclusion

The analysis employed to reach the conclusion that Moody is entitled to claim a Texas homestead is arduous and fraught with legal minefields, some of which constitute issues of first impression. However, when the layers of deception are peeled away, one conclusion emerges. Despite the flurry of perplexing real estate deeds, Moody intended to maintain a Texas homestead at all times. The conveyances of homestead property were motivated by the misguided purpose of protecting Moody's home from a judgment creditor, a protection already engraved in stone by Texas jurisprudence. While the result may appear inequitable and arcane, Texas courts for well over a century have jealously protected the homestead rights of Texas citizens, notwithstanding the fact that by doing so, a dishonest debtor may be assisted in the process in concealing assets from his creditors.

As one jurist has aptly stated:

"Saints and sinners have equal constitutional rights to a homestead. The exemption law shields the home of a debtor's family from the claims of his creditors, regardless of his station in life or society."

*Garrard v. Henderson,* 209 S.W.2d 225 (Tex.Civ.App.—Dallas 1948, no writ). (Chief Justice Bond)

The Court is duty bound to apply Texas law. Accordingly, Moody is entitled to enjoy the benefit of the Texas homestead exemption.