**C. D. SHAMBURGER LUMBER CO., Inc., et al. v. DELAVAN et al.**

No. 4759.

Court of Civil Appeals of Texas. Amarillo.

May 10, 1937.

Rehearing Denied May 31, 1937.

Vickers & Campbell, of Lubbock, for C. D. Shamburger Lumber Co.

McWhorter & Howard, of Lubbock, for Willie Delavan et al.

Jno. B. Daniel, of Temple, and Bean & Bean, of Lubbock, for H. C. Glen, receiver.

Robert A. Sowder, of Lubbock, for Panhandle Const. Co.

STOKES, Justice.

On the 22d day of March, 1929, J. E. Delavan, under a written contract, purchased from R. W. Crowder a tract of land located within the corporate limits of the city of Lubbock, approximately 173 feet north and south by 358 feet east and west. The tract was known as the Ferris place and had never been subdivided into lots, and no alley ran through it. It was bounded on the east by Avenue H and on the west by Texas avenue. As consideration for the property, Delavan executed six notes in the sum of $1,000 each, which were afterwards assigned to Temple Trust Company and extended by a new note in the sum of $6,000, payable in 125 monthly installments of $75 each; the renewal note being secured by a deed of trust, which provided for subrogation to the vendor's lien retained in the deed from Crowder. The contract of sale provided that Delavan should immediately begin the erection on the property of twenty cabins and a gasoline filling station, and should complete the same as early as possible, and thereafter maintain the premises in a good state of repair.

There was a large dwelling located on the premises which was dismantled, and the lumber and other material composing the same used in the construction of the cabins.

On December 4, 1930, in order to complete the construction of the cabins, Delavan and his wife purchased from C. D. Shamburger Lumber Company, Inc., $2,500 worth of lumber and other building material, and executed to the company their note, payable in fifty monthly installments of $50 each, and secured the same by a materialman's lien; it being recognized as a second lien on the property.

On the 12th of June, 1930, the governing body of the city of Lubbock determined to improve, grade, and pave Avenue H, which extended along the east end of the property, and caused the plans and specifications for the paving to be drawn, advertised, and let the contract for the work to the Panhandle Construction Company, and entered into a contract with such company to pave Avenue H, and after the hearing and other statutory requirements were complete, assessed against the entire tract of land the sum of $1,351.09, issuing the proper improvement certificate for such amount in favor of the Construction Company and fixed a lien on the entire property to secure the same in accordance with the statute and the charter provisions of the city of Lubbock, which was operating under a special charter adopted under the Home-Rule Amendment (Const. art. 11, § 5).

Immediately after purchasing the property, Delavan began the construction of the cabins and filling station, preparatory to the establishment of a tourist camp on the property, dismantled the old Ferris residence, and prosecuted the construction work continuously. In February, 1930, the

family moved into two of the cabins and have resided there continuously since that time. The cabins consisted of two rows, the first row beginning at the northeast corner of the property and extending west 130.8 feet, all being under one roof, the row consisting of seven cabins and six garages, the garages alternating with the cabins after the first two cabins. After moving onto the property and the filling station was completed, Delavan rented the filling station to a tenant for some thirteen months, and the record shows he did this in order that he and his sons could devote their time to the erection of the second row of cabins and garages which began at the southeast corner of the property and extended west, being a duplicate row to the first. The filling station was located between the two rows of cabins and fronted on Avenue H, being located near the center of the east line of the property, and contained a room large enough and suitable for the purpose of a small grocery store.

On May 13, 1931, appellant C. D. Shamburger Lumber Company, Inc., filed suit against J. E. Delavan and wife, Willie Delavan, in the Seventy-Second district court of Lubbock county, to recover on its $2,500 note and foreclose its mechanic's and materialman's lien on the entire property, alleging that certain installments were due and unpaid, and declaring the entire note due and payable. It made the Panhandle Construction Company a party defendant, alleging that it was claiming and asserting some character of lien against the property, but alleging that such lien was subordinate to the lien of plaintiff. The Shamburger Lumber Company also alleged that its lien was subject and inferior to the lien held by the Temple Trust Company, and prayed for foreclosure, subject to such lien.

The Temple Trust Company, through its receiver, H. C. Glenn, answered, asserting its deed of trust lien, but did not pray for a foreclosure, merely praying that it be dismissed with its costs.

On October 29, 1932, J. E. Delavan died, and on the 15th of January, 1934, the Panhandle Construction Company filed its third amended original answer, making his surviving children, James Henry, Edwin, Terrell, Neal, and Madeline Delavan, who were minors, and Eva Mae Quinn, a married daughter, and her husband, J. C. Quinn, parties defendant.

The Panhandle Construction Company alleged that its paving certificate constituted a first and superior lien on all of the property, and sought foreclosure thereof. The Shamburger Lumber Company sought foreclosure of its mechanic's and materialman's lien and alleged that the property was the residence and business homestead of J. E. Delavan at and before the governing body of the city of Lubbock determined to construct the pavement on Avenue H, and that, therefore the paving certificate constituted no lien whatever thereon.

The Temple Trust Company did not pray for a foreclosure of its lien, but it also alleged the homestead character of the property, and likewise the defendants Willie Delavan and her children alleged the homestead character of the property in the same manner, and contested the foreclosure of the paving certificate, but did not contest the claims asserted by any of the other defendants.

The cause was tried on the 23d of June, 1936, before a jury, and the trial judge instructed the jury to return a verdict in favor of the plaintiff against the defendants Willie Delavan and her children, for foreclosure of its lien upon all of the property in controversy, which was done, and he also instructed the jury to find in favor of the Panhandle Construction Company and against all of the other parties to the suit as to its paving lien, but limited the foreclosure to the west half of the tract and the south row of cottages or cabins, with a sufficient number of feet north of same to permit the necessary and free use thereof for the purpose for which they are used and intended, and required the jury to establish the number of feet on the north side which would be necessary for that purpose. Responding to the instruction, the jury found in favor of the Panhandle Construction Company as directed and fixed fifteen feet on the north as being necessary for the free use of the south row of cottages for the use intended, which was the ingress and egress of automobiles to the garages located between the cabins or cottages.

The court also submitted one special issue, which required the jury to find whether or not it was the intention of J. E. Delavan, when he leased the filling station, definitely to resume the operation of the same at the expiration of the lease, which the jury answered in the affirmative.

The trial judge found that from the undisputed evidence, and upon the answers to the special issues, the Shamburger Lumber Company had a valid lien for $3,360.18, which it was entitled to have foreclosed upon all of the property, subject to the established lien in favor of Glenn, receiver of Temple Trust Company, and also foreclosed the paving lien of the Panhandle Construction Company as a first and superior lien on the south row of cottages, including fifteen feet north of the same, and also on the west one-half of the entire tract of land, and decreed that the west one-half and the south row of cottages should be first sold, and in the event they did not bring a sufficient amount to discharge its judgment, which amounted to $1,999.68, and the judgment of plaintiff, Shamburger Lumber Company, then the north row of cottages and the filling station should be sold to satisfy any balance due the latter company.

All parties to the suit, including the plaintiff and all of the defendants, excepted to the judgment and gave notice of appeal, and have perfected their various appeals to this court.

We are confronted at the outset with an assignment of the Panhandle Construction Company to the effect that the pleadings of the defendants are not sufficient to form the basis of a judgment establishing the homestead character of the property, especially as to the business homestead. No special exception was urged in the trial court concerning the sufficiency of the pleadings in that regard, and the case seems to have been tried throughout by all the parties, including the Panhandle Construction Company, upon the contention of homestead vel non, both business and residential. We think the pleadings are sufficient to inform the court and all adverse parties in the case of the fact that the principal contention of the plaintiff and the defendants Delavan and Glenn, receiver, was that the property constituted the residential homestead of Delavan and his family and the business homestead of J. E. Delavan and his wife as operators of a tourist camp from March 22, 1929, the date they contracted to purchase the property, continuously up to the time of the filing of the pleadings. If they were, they met the principal requirements of pleading, since the purpose of pleading is to inform the court and the adverse parties to the litigation of what the contentions of the pleader will be upon the trial of the case. The pleadings were not subject to general demurrer and the office of special exceptions is to place in the hands of an adverse party a medium by which he can force clarification and specifications when they are not clear or sufficiently specific. While the pleadings are subject to some criticism in this regard, we think they are sufficient for all practical purposes and the complaining company not having urged a special exception in the trial court, these assignments are overruled. Whaley Lumber Co. v. Citizens' Nat. Bank (Tex.Civ.App.) 57 S.W. (2d) 637; Southern Cas. Co. v. Morgan (Tex.Com.App.) 16 S.W.(2d) 533.

The controlling question in the case is that concerning the homestead character of the property. It is not disputed that in February, 1930, J. E. Delavan and his wife sold the home in which the family lived on another street in the city of Lubbock and, with their family of six children, removed to this property, They established their place of abode in the two east cabins of the north row, and lived there continuously until the death of J. E. Delavan, and the family has continued to live there since. During a portion of this time some of the boys slept in the cabins on the south side. There were some fruit trees on the west end of the property, and the family at various times used a portion of the west end for a garden spot on which they raised vegetables for their own use and occasionally sold some of the vegetables to their guests in the tourist camp. A portion of the west end was also used as a playground for the children, and the record shows it was frequently utilized as a camp ground, and guests who did not desire cabins or cottages would camp there at night.

The combined filling station and grocery store had been operated by J. E. Delavan and other members of the family, and no question is raised as to its abandonment, although it was rented for thirteen months at one time and for a few months at another time. The record contains no proof of the abandonment of the garden spot as such, nor of the playground as such. This vacant portion is still being utilized in connection with the tourist camp as a camp ground for guests who do not desire cottages or cabins. It can hardly be questioned that the north row of cottages comes well within the homestead exemption laws of this state as a residence homestead. It

has been held a number of times that the family is entitled to a space sufficient for a playground for the children and a garden spot upon which to raise vegetables for family use, and that such spaces are exempt in addition to, and in connection with, the actual ground upon which the dwelling house is located.

The appellants Willie Delavan and her children, Shamburger Lumber Company, and Glenn, receiver, all take the position that, in addition to the north row of cottages and the west end' of the property being exempt to the Delavan family as a residence homestead, the entire property is exempt to them as a business homestead. This makes it necessary for us to determine the question of whether or not the operation of a tourist camp comes within the purview of a place to exercise the calling or business of the head of a family, as provided in the Constitution.

■ The earlier Constitutions of this state provided for the exemption of "the homestead of a family." There was no constitutional definition of the term nor limitation of the extent of the exemption, but in the early case of Pryor v. Stone, 19 Tex. 371, 70 Am.Dec. 341, the Supreme Court, speaking through Chief Justice Hemphill, said: "All that, by fair construction of the language, is required to entitle the property to exemption, is, that the property should be used for the convenience or uses of the head or members of the family. The exemption should not be construed as reserving merely a residence where a family may eat, drink and sleep, but also a place where the head or members may pursue such business or avocation as may be necessary for the support and comfort of the family."

In that case it was held that the office of a lawyer was exempt, although the constitutional provision only encompassed "the homestead of a family." Thus the judiciary of this state at an early day wrote into the meaning of the homestead idea a place where the head or members may pursue such business or avocation as may be necessary for the support and comfort of the family.

At a later date, however, in the case of Iken v. Olenick, 42 Tex. 195, the Supreme Court, through Justice Moore, restricted the meaning and in effect destroyed the liberality of construction given by Justice Hemphill, and held that the homestead ex-emption applied only to the "mansion house" and land for its use. This change in the aspect of the homestead exemption was made in the year 1875, only one year before our present Constitution was adopted. The people of the state, under the liberal interpretation of Justice Hemphill, had become accustomed to considering the homestead as being not only a place where the family lived, but also a place where the head of the family may exercise his calling or business. When it was discovered that so sacred and important a feature of the well-being and economic existence of the people of the state was thus subject to judicial caprice and may be changed or restricted at any time by the enlarged or restricted benevolence which happened to pervade the breast of the judge writing the opinion, the first opportunity which presented itself to establish permanently the broad and liberal views expressed by Justice Hemphill in the Pryor Case was seized upon and became available in the writing of our present Constitution in 1876, which for the first time embodied in the fundamental law of the land a definition of the word "homestead." Section 51 of article 16 of that document was thus made to read as follows: "The homestead * * * in a city, town or village, shall consist of lot, or lots, not to exceed in value five thousand dollars, at the time of their designation as the homestead, without reference to the value of any improvements thereon; provided, that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the head of a family." Waggener et al. v. Haskell et al., 89 Tex. 435, 35 S.W. 1.

This provision has consistently been given a most liberal construction in order to carry out the obvious purpose which the people had in adopting it. The circumstances of its inclusion in the Constitution have, no doubt, been a constant reminder to the courts since its adoption of the underlying purpose and the desire which pervaded the breasts of the people when it was adopted.

In the case of Shryock v. Latimer, 57 Tex. 674, Justice Stayton, in speaking of what has come to be commonly known as the "business homestead," said:

"The words 'calling' and 'business' are evidently used in the constitution in a very broad sense when taken together, but the signification of each one is uncertain; yet

we are to infer that they were not used to designate the same thing.

"Taken together, they certainly embrace every legitimate avocation in life by which an honest support for a family may be obtained.

"The former was probably used in the sense of 'profession' or 'trade,' which would embrace all such employments as by course of study or apprenticeship in any of the learned professions, liberal arts, or mechanical occupations, a person has acquired skill or ability to follow, and which has become practically a matter of personal skill, in its nature not temporary in existence.

"The latter word was probably used in contradistinction to the other, to denote that which Mr. Webster defines to be the general meaning of the word, 'that which occupies the time, attention and labor of men for the purpose of profit or improvement,' and this may be temporary. * * *

"The 'calling' may exist as a fact, whether it be practiced or not; with the other, the actual employment in the given occupation furnishes the only means to determine whether the 'business' exists or not."

■ The law has never undertaken to restrict or define the kind or character of business in which the head of a family should engage, being satisfied to limit it only to legitimate business. The head of the family has the right to select any kind of business in which he chooses to embark, and, whatever may be the kind or character of business chosen by him, he is entitled to the same exemptions under the law as the man who is engaged in any other line of business.

■ The record in this case shows that J. E. Delavan had operated a tourist camp before he purchased the one involved in this case. The former camp had been rented by him, and after his tenancy expired, he purchased and moved into a home in the city of Lubbock. It is conclusive from the record that he purchased the property involved in this case for the very purpose of establishing thereon a tourist camp. It was his intention, as expressed in the contract of purchase, to build cottages or cabins and other structures and devices commonly used in, and necessary to, the operation of a modern tourist camp. Immediately after purchasing the property he began to dis-mantle the large residence located thereon, and used the lumber and other material in building the cottages and filling station. It is undisputed that the tourist camp had a name and was known as "The Dixie Camp"; that it was opened for business each morning at 7 o'clock, and remained open until 11 o'clock at night, when it was closed up for the night. It was shown that the operation of the camp required the constant and diligent attention of not only Mr. Delavan, but of other members of the family. It is a matter of common knowledge, and one of which this court will take judicial notice, that tourist camps exist all over the country and in practically every town and village of not only this state but every other state in the Union. They are, no doubt, the modern offspring of the old-fashioned Texas wagon yard, which, in the early days of this state, supplied the same demand of the traveling public. It was shown by the testimony, and is also well known, that the modern tourist camp consists of cabins or cottages for tourists or guests, bath house, filling station, grocery store, and many of them have plots of ground in connection for the use of tourists who desire to avoid the expense incident to the renting of cottages.

■ A "business," as distinguished from "calling," is that which occupies the time, labor, and efforts of its owner or operator, and we think it is doing no violence to the term to say that operating a tourist camp is as distinctive a business as operating a grocery store, a gristmill, or print shop. If it is, then it cannot be questioned that the head of a family who owns and operates a tourist camp is entitled to protection under the Constitution and laws of the state in the same degree as the head of a family who owns and operates any other class of business.

The Construction Company cites us to the case of Mays v. Mays et al. (Tex.Civ. App.) 43 S.W.(2d) 148. That case grew out of an application of Mrs. Allie Mays, surviving widow of John Mays, deceased, to the county court, and later to the district court on appeal, to have certain property of the estate of her deceased husband set aside to her as her homestead. She alleged that the occupation of her deceased husband was that of building and renting tenant houses and using the rents therefrom to support his family. It was shown that he owned fifteen lots in the town of

Jasper. One of these lots fronted upon the highway, and the others fronted upon a street, but the property was contiguous. The family lived in the house fronting upon the highway, and Mays had constructed ten tenant houses on the remaining lots which were continuously rented by him and the proceeds used for the support of his family. It was shown that the only occupation of John Mays was that of building tenant houses and renting them. The application was denied by the district court, and the Beaumont Court of Civil Appeals affirmed the judgment, holding that the contention that all of the houses constituted the homestead could not be sustained. The effect of the decision was to hold that the building and renting of houses is not a "business" as that term is used in the Constitution. We agree with the holding of the Beaumont Court of Civil Appeals. The essential elements of the term "business" as used in the Constitution are lacking in the operations which the plaintiffs in that case sought to bring within the purview of a "business."

The case of Lyon v. Files, 50 Tex.Civ. App. 630, 110 S.W. 999, is also relied upon by the Construction Company. That was a case in which the owner had built an extra house on the lot which constituted his homestead, and had alternated his residence in the two houses. He was a very aged man, unable to work, and depended upon the rent from the second house for the sustenance of himself and his wife. The contentions of the appellee in that case, like the Mays Case, were wholly lacking in the elements contemplated in the constitutional term "business" as determined by Chief Justice Stayton in the Shryock Case, supra. They did not encompass the idea of "that which occupies the time, attention, and labor of men for the purpose of profit or improvement." A man could own many rent houses and yet devote his business hours, time, labor, and attention to other business. In fact, owning and renting houses requires little time or attention and does not comport to the general idea of a distinctive business. It would be more accurate to class it as an investment.

The case of Gates v. Pitts (Tex.Civ.App.) 2 S.W.(2d) 307, is also cited by the Construction Company as being a case in point and to the effect that a tourist camp is not the kind of place which is exempt to the head of a family as a business homestead.

The Gates Case simply holds that the head of the family can hold as exempt only one place of business. Gates had two places of business, one a mercantile establishment or store which he personally managed and in which he worked, and the other a garage and filling station across the street and entirely disconnected from the store. An execution was levied on the garage and filling station and the court held it was not exempt.

To the same general effect are the cases of Hargadene v. Whitfield, 71 Tex. 482, 9 S.W. 475; Cain v. Dickson (Tex.Civ.App.) 78 S.W.(2d) 1095; McDonald v. Campbell, 57 Tex. 614; Rock Island Plow Co. v. Alten, 102 Tex. 366, 116 S.W. 1144; Hinzie v. Moody, 1 Tex.Civ.App. 26, 20 S.W. 769; and many others that could be cited. These cases proceed upon the constitutional distinction between a residence exemption and the exemption provided for a place of business. In the former it is described as being "lot or lots * * * used for the purposes of a home"; whereas, in the latter it is described as "a place to exercise the calling or business of the head of a family." The lot or lots are exempt if they are *used* for the purposes of a home and there is no limitation placed upon their number, area, or location. They do not have to be contiguous if they are *used* for the purpose of a home. In designating the exemption for a business, the language is entirely different. It is *a place* to exercise the calling or business of the head of the family, and means *one place*. It must be a unit and cannot consist of several places. The courts have been consistent in maintaining this distinction and many cases could be cited in support of it.

In the case of Maroney Hardware Co. v. Connellee (Tex.Civ.App.) 25 S.W. 448, 449, an execution had been levied upon a small house and a small warehouse located in the mill yard of Connellee, who was engaged in the operation of a mill. A portion of the vacant area within the premises was used as a camp ground and wagon yard for the customers of the mill and the small house had been rented out temporarily. It was built for a lodging place for customers at night. The camp ground and the two small structures were separated from the milling plant by a fence and a vacant lot lay between them and the mill. In holding the two small houses to be exempt, the court said: "We believe that, to a miller, not

**358**

only the mill house with the land upon which it is actually situated should be exempt, but also the mill yard and outhouses adjacent and used in connection therewith; and the jury having found, upon what we regard as sufficient evidence, and under a charge strictly fair and liberal to appellants, that that part of the block in controversy is reasonably necessary to the exercise of appellee's business, their verdict should not be disturbed. That the mere temporary renting of a portion of these lots would not deprive them of the homestead character is expressly provided by our constitution, and recognized in numerous decisions of our supreme court."

■ The evidence showed, without contradiction, that the tourist camp was a unit. It was all on one tract of land with no alley running through it. Every structure which composed it, and every foot of the land upon which it was located, was used in connection with it, was necessary to its proper operation, and the contention that, because its operation in the usual manner in which such enterprises are operated involved the renting of the buildings and thereby deprived its owner of the benefit of the constitutional exemption as a place to exercise his calling or business, is untenable. The entire premises was *a place* to carry on the business of its owner who used it as such and we think it was exempt under article 16, § 51, of the Constitution.

Other assignments of error complain of the division made of the property by the trial court and the manner in which the liens were foreclosed, but the view we take of the case makes it unnecessary to pass upon them.

The trial court foreclosed the paving lien on a portion of the property which was error for which the judgment must be reversed and, as there was no controversy between the litigants other than that involved in the question of the validity of the paving lien, and the case seems to have been fully developed upon the trial, judgment will here be rendered that the Panhandle Construction Company take nothing, and the plaintiff, Shamburger Lumber Company, Inc., have foreclosure of its mechanic's and materialman's lien upon all of the property for the amount of its debt as established by the judgment of the trial court, subject to the first lien held by H. C. Glenn as receiver of the Temple Trust Company.