In re Robert D. PERRY, Debtor.

No. 00–51188–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 12, 2001.

Steven G. Cennamo Warncke, Miller & Greer, San Antonio, TX, for Debtor.

Randolph N. Osherow, San Antonio, TX, trustee.

### ORDER AND MEMORANDUM ON CREDITORS' OBJECTIONS TO DEBTOR'S CLAIMED EXEMPTIONS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the objections of Bank and Trust, S.S.B., ("Bank") and Dennie and Ellen Dearing ("Dearings") to certain claimed exemptions of Robert D. Perry ("Perry" or "Debtor"). A trial was held on the merits of these objections and the court took the matter under advisement. The court now issues its findings of fact and conclusions of law.

### I. BACKGROUND

In 1980, Perry executed a Contract for Deed to purchase 25.28 acres of real property in Val Verde County from Norman Christie ("Christie"), for a purchase price of $225,000.00. The terms of the agreement were $45,000.00 to be paid in cash, plus assumption of the first lien mortgage on the property, in the amount of $76,000.00. The remainder of the purchase price was to be in the form of a note to Christie, secured by a vendor's lien.

On February .8, 1983, Christie and his wife, Jovita Christie, delivered an assumption warranty deed with vendor's lien conveying the 25.28 acres to Perry and his wife, Estella Perry. This deed was filed for record on June 29, 1983. As agreed in the Contract for Deed, Perry and his wife assumed the first lien debt owed by the Christies, by then in the approximate amount of $71,411.90. This indebtedness was owed to Commercial Loan Insurance Corporation of Milwaukee, Wisconsin, and was secured by a duly recorded deed of trust on the property. The Perrys also executed a promissory note in the original principal amount of $135,355.00 in favor of the Christies, secured by a second lien deed of trust. The deed of trust was executed on June 8, 1983, and filed of record on June 29, 1983.

On December 5, 1985, Perry and his wife conveyed the 25.28 acre tract to a wholly-owned corporation, American Campgrounds, Inc. ("American Campgrounds"), which corporation in turn obtained a loan from the Bank and Trust, S.S.B., formerly Del Rio Bank and Trust Company, in the original principal amount of $127,000.00. This loan was secured by a deed of trust lien on the 25.28 acre property, and was executed on the same date. Out of the proceeds of the loan, American Campgrounds paid $73,443.04 to Commercial Loan Insurance Corp. to pay off the holder of the first lien deed of trust, paid $44,850.26 to the Bank to satisfy an unsecured loan that Perry had with the Bank, paid $1,699.66 to satisfy outstanding ad valorem property taxes, and paid $4,066.50 in closing costs. Additionally, Christie and his wife agreed to subordinate their $135,355.00 mortgage lien (the second lien that the Perrys gave the Christies as part of the original purchase price for the property) to the Bank's new $127,000.00 deed of trust lien.

On June 29, 1993, Perry and his wife refinanced their corporation's loan from the Bank by entering into a new loan in the amount of $178,000.00, secured by the self-same 25.28 acres—the very property which had previously been conveyed to American Campgrounds. There are no deeds reconveying the property back to the Perrys from American Campgrounds. Instead, Perry and his wife executed an affidavit declaring that American Campgrounds was their wholly-owned corporation, that they had assumed all liabilities of the corporation, and that the corporation was now defunct and was no longer doing business. Out of the closing proceeds of this new loan, $103,424.78 was paid to

Christie to pay off that mortgage, $96,923.52 was paid to the Bank to pay off the balance of the American Campgrounds loan, $602.07 was paid for ad valorem property taxes, and $2,994.43 was paid for closing costs. Christie and his wife transferred their mortgage lien on the 25.28 acres to the Bank. Three years later, on May 20, 1996, Perry and his wife filed a homestead designation for the 25.28 acre tract, claiming the property as their homestead.

On May 1, 2000, Perry filed for chapter 7 protection. In his bankruptcy schedules, Perry listed that he owned 90 acres of real property[1] on Hwy 90 West, Del Rio, Val Verde County, Texas, with a market value of $800,000.00. In Schedule C, Perry claimed his equity in the 90 acres as exempt under Section 41.002 of the Texas Property Code. The schedules reflected an outstanding lien of $172,000 still owed to the Bank on this property. In Perry's Statement of Intention, Perry announced his intent to reaffirm the following debt pursuant to 11 U.S.C. § 524(c): "26 acres out of the 90 acres of campground" with Del Rio Bank & Trust; "59 acres out of the 90 acres" with L.R. Diest; and "homestead" with Del Rio C.I.S.D. In fact, however, none of the parties to this proceeding entered into reaffirmation agreements with Perry, as none were file. Perry received his discharge on February 6, 2001.

On May 19, 2000, the Dearings[2] filed an objection to Perry's claimed exemption in

---

1. The claimed exempt property consists of five tracts: (1) 59.51 acre tract, (2) 23.66 acre tract, (3) 1.34 acre tract, (4) 1 acre tract, and (5) 20 foot strip of land. For purposes of this ruling, the court will refer to the first tract of land as the "59 acre tract" and the other four tracts of land (discussed above) as the "26 acre tract."

2. Perry and the Dearings have been involved in some prior state law litigation. The facts of this dispute are set forth in the unpublished opinion of *Perry v. Dearing*, 1998 WL 374935 (Tex.App.-San Antonio, 1998, no writ). There, the state court of appeals found that in a written agreement dated March 25, 1993, Dennie and Ellen Dearing agreed to purchase the American Campground and RV and Mobile Home Park in Del Rio, Texas from Robert Perry for $650,000. In the agreement, the Dearings agreed to make a down payment of $216,666 (of which $10,000 was paid at the time). The agreement also provided that the sale would be effective when the Dearings paid the balance of the first one-half of the down payment, with the remainder of the purchase price to be financed by Perry.

In August 1993, the parties executed a second written agreement, which reduced the purchase price to $620,000 and reduced the down payment to $186,000. The Dearings then paid Perry $88,333 and took possession of the park. Subsequently, on August 12, 1993, Perry signed a notarized statement recognizing the Dearings had paid one-half of the down payment. The Dearings made the specified monthly payments of $4,100.25 in each of the succeeding twelve months.

In August 1994, when the second half of the down payment was due, the Dearings relinquished possession of the campground and sued Perry for breach of contract for failure to provide the Dearings with a deed upon their payment of the first one-half of the down payment. The case was tried to a jury, which returned a verdict finding Perry breached an enforceable oral agreement to deliver a deed to the Dearings upon their payment of the first one-half of the down payment (Jury Questions 1–4); engaged in false, misleading, or deceptive acts or practices (Jury Question 8); engaged in an unconscionable act or course of action (Jury Question 9); and engaged in such conduct knowingly (Jury Question 11). But, the jury also found that Perry did not commit fraud against the Dearings (Question 6). On appeal, the court found that the record supported the jury's determinations.

When Perry filed for chapter 7 relief, the debt owed to Dearings was approximately $282,743.46. On September 29, 2000 the Dearings filed an adversary proceeding for summary judgment against Perry's estate, challenging the dischargeability of Dearings' state court judgment against Perry. This court ruled that the judgment was non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

the 26 and 59 acre tracts. On September 18, 2000, the court held an evidentiary hearing on the Dearings' objections to Perry's claimed exemptions. At that hearing, the court took evidence as to the rural nature of the 59 acre tract. The court also heard evidence regarding the nature of the 26 acre tract, including evidence regarding the circumstances surrounding the Bank's acquisition of its lien on the tract, as has been detailed *supra*. The Bank, however, was not a participant in the September 18 hearing. The court expressed some concern that a ruling as to the exempt status of the property could have an adverse impact on the efficacy of the Bank's asserted lien on the property (given that the debtor was claiming that the original mortgage granted to American Campgrounds was a sham transaction designed to evade Texas' homestead laws). The court accordingly suspended the hearing and directed the parties to give the Bank notice of the nature of the hearing (including the aforementioned concerns expressed by the court on the record at that time). The Bank was given an opportunity to intervene in the action.

In response to the court-directed notice, the Bank filed its own objection to Perry's claimed exemption in the 26 acre tract. On January 10, 2001, the court held a further evidentiary hearing, limited to the matters not already tried at the September hearing.[3] At the conclusion of the hearing, the court made several findings of fact on the record, but took the bulk of its ruling under submission. Specifically, the court found that the December 5, 1985 conveyance of the 26.28 acre tract to American Campgrounds, done in contemplation of the loan of $127,000.00 to American Campgrounds from the Bank, was *not* a sham, or pretended, conveyance. The legal impact of this finding under Texas state law,[4] of course, was that Perry must be held to have abandoned his homestead interest in the Property when he conveyed it to American Campgrounds. *See Eckard v. Citizens Nat. Bank in Abilene,* 588 S.W.2d 861, 862 (Tex.Civ.App.—Eastland 1979, writ ref'd. n.r.e.) (absent evidence of a "pretended sale," homestead claimants abandoned their homestead interest when they conveyed the property to their solely owned corporation); *Nowlin v. Wm. Cameron & Co.,* 54 S.W.2d 1035, 1036 (Tex.Civ. App.—Fort Worth 1932, writ refused) (where drug store was business homestead, and spouses transferred stock to

3. The September 18 hearing focused almost exclusively on whether the 59 acre tract qualified as Perry's homestead. The January 10 hearing addressed the status of the 26 acre tract. The Dearings object to Perry's claimed exemption in both tracts of land. The Bank only objects to Perry's claimed exemption in the 26 acre tract.

4. Had Perry chosen the federal exemptions under 11 U.S.C. § 522, the arguments and analysis in this case would be appreciably different. First, this court would not need to deal with the "sham conveyance" issue because federal law does not tolerate such conveyances. *See In re Holt,* 84 B.R. 991, 1007–08 (Bankr.W.D.Ark.), aff'd, 97 B.R. 997 (W.D.Ark.1988), aff'd, 894 F.2d 1005, 1008 (8th Cir.1990); *Ford v. Poston,* 773 F.2d 52, 55 (4th Cir.1985); *In re Reed,* 700 F.2d 986,

991 (5th Cir.1983). Second, assuming Perry regained an interest in the 26 acre tract after he conveyed it to American Campgrounds (discussed below), the federal exemptions would not distinguish between an "urban" and "rural" homestead, nor would federal law care whether the 26 acre tract was used for "residential" or "business" purposes (also discussed below). Put simply, the Bankruptcy Code allows a debtor to exempt his or her interest in any property of the estate up to the allowable amount. *See* 11 U.S.C. §§ 522 and 541; *see also Matter of Smith,* 640 F.2d 888, 891–92 (7th Cir.1981); *Wissman v. Pittsburgh Nat. Bank,* 942 F.2d 867, 870–71 (4th Cir. 1991). Finally, in contrast to Texas homestead law, the federal exemptions would place monetary limits on the debtor's claimed exemptions. 11 U.S.C. § 522(d).

corporation formed to own and operate store property lost homestead character); *Nash v. Conatser,* 410 S.W.2d 512, 521–22 (Tex.Civ.App.—Dallas 1966, no writ) (when a business homestead is conveyed to corporation in which stock is owned by grantors, property is no longer grantors' homestead, even though they continue to occupy it, valid title is vested in corporation, and property is subject to corporation's debts); *Mayfield v. First State Bank of Holland,* 19 S.W.2d 454, 455 (Tex.Civ.App.—Austin 1929, no writ) (husband and wife, as officers of corporation to which they conveyed business homestead subsequently assigning property to others whose possession for year was not questioned, abandoned homestead); *see also In re Yamin,* 65 B.R. 938, 943–944 (Bankr.S.D.Tex.1986) ("When a party transfers his property into a corporation or permits a corporation to hold title for him, he abandons such homestead interest, even if he continues to occupy that property.").

## II. ISSUES

The court has taken two issues under submission: (1) whether the 59 acre tract qualifies as a rural homestead; and, (2) whether Perry can exempt the 26 acre tract as his rural homestead notwithstanding the aforementioned abandonment.

## III. ANALYSIS

■ The initial burden of proof in establishing the existence of a homestead is on the claimant. *In re Moody,* 77 B.R. 580, 592 (S.D.Tex.1987) (citing *Burk Roy-*

alty Co. v. Riley, 475 S.W.2d 566, 568 (Tex.1972); *Pace v. McEwen,* 617 S.W.2d 816, 818 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ)). Once established, the burden shifts to the party "seeking turnover of the homestead in satisfaction of a judgment to disprove its continued existence." *Id.* (citing *Lifemark v. Merritt,* 655 S.W.2d 310, 314 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd, n.r.e.)). The law presumes that the homestead continues to exist until it is terminated. *See Sullivan v. Barnett,* 471 S.W.2d 39, 43 (Tex.1971). In Texas, a homestead is terminated through death, abandonment or alienation. *See Long Bell Lumber Co. v. Miller,* 240 S.W.2d 405, 406 (Tex.Civ.App.—Armarillo 1951, no writ); *Hollifield v. Hilton,* 515 S.W.2d 717, 721 (Tex.Civ.App.—Ft. Worth 1974, writ ref'd. n.r.e.). The burden of proving termination of the homestead is upon the party asserting termination. *See Sullivan v. Barnett, supra* at 43; *Rancho Oil Co. v. Powell,* 142 Tex. 63, 175 S.W.2d 960, 963–64 (1943); *Gill v. Quinn,* 613 S.W.2d 324, 326 (Tex.Civ.App.—Eastland 1981, no writ).

### 1. Does the 59 Acre Tract Qualify as a Rural Homestead?

■ The question of whether a homestead is rural or urban is one of fact. *In re Davis,* 152 B.R. 133, 135 (S.D.Tex.1992); *see also R.B. Spencer & Co. v. Green,* 203 S.W.2d 957, 959 (Tex.Civ.App.—El Paso 1947, no writ).[5] Traditionally, Texas courts have examined several factors to determine whether a homestead is rural or

5. Whether the homestead is rural or urban is an important consideration under Texas law. A rural homestead for a family, for example, may consist of one tract of land not more than 200 acres, or several parcels of land, aggregating not more than 200 acres. Tex. Prop.Code § 42.001(b); *see also Woodward v. Sanger Bros.,* 246 F. 777, 780 (5th Cir.1917), *cert. denied, Sanger v. Woodward,* 246 U.S. 674, 38 S.Ct. 425, 62 L.Ed.932 (1918). An urban homestead, by contrast, is limited to 10 acres. Tex. Prop.Code § 42.001(a). Another important difference is that the operation of a calling or business on a rural homestead forfeits the homestead protection on that part of the property; the operation of a calling or business on an urban homestead does not forfeit the homestead protection on that property (discussed below).

urban: (1) the location of the land with respect to the limits of the municipality; (2) the situs of the lot in question; (3) the existence of municipal utilities and services; (4) the use of the lot and adjacent property; and (5) the presence of platted streets, blocks, and the like. *See Vistron Corp. v. Winstead,* 521 S.W.2d 754, 755 (Tex.Civ.App.—Eastland 1975, no writ); *Rockett v. Williams,* 78 S.W.2d 1077, 1078 (Tex.Civ.App.—Dallas 1935, writ dism'd); *Purdy v. Grove,* 35 S.W.2d 1078, 1081–82 (Tex.Civ.App.—Eastland 1931, writ ref'd); *see also* 43 Tex.Jur.3d Homesteads § 15 (1985) (and cases cited therein).

In 1989, a new part c was added into § 41.002 of the Texas Property Code, to address some confusion in the cases. The new section reads as follows:

(c) A homestead is considered to be urban if, at the time the designation is made, the property is:

(1) located within the limits of a municipality or its extraterritorial jurisdiction or a platted subdivision; and

(2) served by police protection, paid or volunteer fire protection, and at least three of the following services provided by a municipality or under contract to a municipality:

(A) electric;

(B) natural gas;

(C) sewer;

(D) storm sewer; and

(E) water.

TEXAS PROP. CODE, § 41.002(c) (Vernon 1989). The interplay between the "traditional" test spelled out in the case law, and the statutory test enacted by the 1989 amendment adding § 41.002(c), is key to determining whether Perry can exempt the 59 acre tract as his rural homestead.[6]

Courts attempting to define a "rural" homestead after the 1989 amendment to § 41.002, have been reluctant to abandon the "traditional" test. This reluctance is detailed in the Fifth Circuit's decision in *Matter of Bradley,* 960 F.2d 502 (5th Cir. 1992), *cert. denied sub nom., Commonwealth Land Title Ins. Co. v. Bradley,* 507 U.S. 971, 113 S.Ct. 1412, 122 L.Ed.2d 783 (1993). In *Bradley,* the court acknowledged that the 1989 version of § 41.002(c) applies to homesteads created before as well as after 1989. *Id.* at 511 n. 18 (citing Tex. Prop.Code Ann. § 41.002(d) (Vernon Supp.1991)). But the court expressed doubt as to the application of § 41.002(c) "in all homestead disputes." *Id.* At the very least, the court noted, § 41.002(c) ap-

---

6. In many respects § 41.002(c) and the "traditional" test mirror one another. Both tests consider the location of the land with respect to the limits of the municipality, the existence of municipal utilities and services and the presence of platted streets and blocks. There is one noteworthy difference: the "traditional" test examines the use of the lot and adjacent lots in question, while § 41.002(c) ignores this factor. *See* Tex. Prop.Code § 41.002(c); *cf. Matter of Crowell,* 138 F.3d 1031, 1034 (5th Cir.1998) (one factor to be considered under the "traditional" test is "the use of the lot and adjacent property."). This difference is significant because although it is settled law that the "use" factor turns on whether the balance of the tract of land is used for the support of the family, *see Ratliff*

v. *Smith,* 178 S.W.2d 138, 140 (Tex.Civ.App.—El Paso 1943, writ ref'd), it is not settled (even among the bankruptcy courts in the Western District of Texas) as to what constitutes "use for the support of the family." This court has held that the property is not being used for the support of family if no economic value is being derived from the property (*e.g.,* by farming or otherwise), *see In re Spencer,* 109 B.R. 715, 716–17 (Bankr. W.D.Tex.1989), whereas other courts have held that "the usage of a rural homestead for the purpose of shelter and comfort is a sufficient usage to support a rural homestead claim." *In re McCain,* 160 B.R. 933, 938 (Bankr.E.D.Tex.1993) (citing *In re Mitchell,* 132 B.R. 553, 557 (Bankr.W.D.Tex.1991) (disagreeing with the *Spencer* analysis)).

plies to threatened foreclosures on homestead property. *Id.* (citing Debate on Tex. S.B. 642, 71st Leg. (May 1989) (remarks of Sen. Parker) ("A question occurred as to exactly what we meant on homestead on this—in this foreclosure provision and this clarifies the term 'homestead.'")). The court went on to observe that "[s]ome language in the legislative history of this section, however, suggests that section 41.002(c) might not displace the traditional common law definition of 'homestead' in all cases.... The availability of municipal utilities and services is merely one factor in this traditional analysis." *Id.* Although the *Bradley* court did not say upon what "legislative" history it was relying,[7] other decisions within the Fifth Circuit have followed its lead by continuing to employ the traditional test to homestead questions in contexts other than foreclosures. *Matter of Crowell,* 138 F.3d 1031, 1034 (5th Cir. 1998) ("This Court has recently expounded, in some detail, the factors to be considered by the bankruptcy court in determining whether any particular property claimed as exempt under Texas law is rural or urban. These factors include '(1) the location of the land with respect to the limits of the municipality; (2) the situs of the lot in question; (3) the existence of municipal utilities and services; (4) the use of the lot and adjacent property; and (5) the presence of the platted streets, blocks, and the like.'"); *U.S. v. Blakeman,* 997 F.2d 1084, 1091 (5th Cir.1992) (stating that the court does not "construe section 41.002(c) to be the exclusive test to determine a property's homestead status: it is but one factor a court considers to determine whether the homestead is urban or rural."); *see also Davis,* 152 B.R. at 135 ("That [whether a homestead is rural or urban] is a question of fact and is not changed by the addition of § 41.002(c) ... the traditional factors considered by the Texas courts are not to be overlooked.").[8]

■ After the *Bradley* decision and ensuing case law, a blended test has emerged for determining whether a homestead is rural or urban. First, the court looks at the factors listed under § 41.002(c) and decides whether the property qualifies as "urban" under those factors. *See Blakeman,* 997 F.2d at 1091; *see also Grisham v. Mabank Bank,* 1999 WL 261849, *3 (N.D.Tex.1999) ("[W]hen analyzing whether the ... homestead is urban or rural, the Court first determines pursuant to section 41.002(c) of the Texas Property Code whether their property is served by municipal utilities and fire and police protection."). If it does not, then the property is rural and that is the end of the inquiry. *Grisham,* 1999 WL 261849, *3. If the property initially qualifies as "urban" under § 41.002(c), however, then the court goes an additional step, balancing that factor with the five factors under the "traditional" test. *See Blakeman,* 997 F.2d at 1091; *see also Grisham,* 1999 WL 261849, *3.

---

7. Another court, perhaps reading too much into the *Bradley* decision, surmised:

 A look at the legislative history of the statute [§ 41.002] does not reveal that the legislature intended or even contemplated displacing the common law method of characterizing a homestead. *See* Debate on Tex.S.B. 642, 71st Leg. (May 1989). It appears that the section was added as an accompanying definition to another statute. [*Bradley*] 960 F.2d at 511 n. 18. Moreover, there is no indication that the legislature intended to extend this statute beyond situations involving threatened foreclosures of homestead property. Without evidence of any such an intent, this Court is reluctant to overrule 100 years of established Texas case law.
 *Davis,* 152 B.R. at 135; *see also U.S. v. Blakeman,* 997 F.2d 1084, 1090–91 (5th Cir.1992) (refusing to overrule 100 years of Texas law).

8. This court has been unable to find any Texas state court decision either following or disagreeing with the *Bradley* analysis.

Accordingly, that is the test we will ·use here. We will first ask whether the 59 acre tract is "urban," as defined by § 41.002(c).

Section 41.002(c) is itself a two-pronged test. The first element asks whether the property is "located within the limits of a municipality or its extraterritorial jurisdiction or a platted subdivision." § 41.002(c)(1). The second element asks two questions: (1) whether the property is served by municipal police protection, paid or volunteer fire protection; and (2) whether a municipality provides the property with three of the following services: (i) electric, (ii) natural gas, (iii) sewer, (iv) storm sewer, and (v) water. § 41.002(c)(2). If the property fails either the (c)(1) test or one of the two inquiries under (c)(2), the property will be deemed rural and the court's analysis will be at an end. If it does not fail either test, only then must the court proceed to the "traditional" test. In this case, we never arrive at the second prong because the property "flunks" one of the (c)(1) in the first prong.

■ The 59 acre tract is not "located within the limits of a municipality or it extraterritorial jurisdiction or a platted subdivision," the first test set out in § 41.002(c). Evidence presented at the September 19 hearing showed that the 59 acre tract of land is approximately six miles outside the city limits of Del Rio,

Texas.[9] Many photos introduced into evidence showed clearly that the 59 acre tract was located nowhere near developed or platted land. The evidence also showed that the 59 acre tract did not fall within the extraterritorial jurisdiction of Del Rio.[10] The 59 acre tract is fairly clearly not within the limits of a municipality or its extraterritorial jurisdiction or a platted subdivision. The tract thus flunks the first "urban" test under § 41.002(c)(2).

As the 59 acre tract fails the first test of "urbanness," the court's inquiry is concluded. We need not consider the second "urban" test under § 41.002(c)(2). We also do not reach the "traditional" test because, it will be recalled, once property is found to be rural, the inquiry is at an end. Accordingly, the 59 acre tract can be exempted as a "rural" homestead under § 41.002(c)(2).[11]

## 2. Does the 26 Acre Tract Qualify as Perry's Rural Homestead?

At the January 10 hearing, the court found that, when Perry deeded the 26 acre tract to American Campgrounds in 1985, Perry intended to and did in fact abandon any homestead interest he might otherwise have had in the property. Perry has one more "hold card," however. On June 29, 1993, Perry and his wife executed an affidavit, stating:

> (5) within five miles of those boundaries, in the case of a municipality with 100,000 or more inhabitants.

TEX.LOCAL GOV'T CODE ANN. § 42.021 (Vernon 1988). Considering the location and size of the City of Del Rio in proximity to 59 acre tract in question, it is clear that the tract of land does not come within Del Rio's extraterritorial jurisdiction.

9. Another court determined that a location five miles from the nearest town or city tended to show that the property was rural in nature. *See Matter of McCain*, 160 B.R. 933, 938 (Bankr.E.D.Tex.1993).

10. Section 41.002 does not define "extraterritorial jurisdiction." Another section of the Texas Code defines "extraterritorial jurisdiction" as follows:

The extraterritorial jurisdiction of a municipality is the unincorporated area that is contiguous to the corporate boundaries of the municipality and that is located:

. . .

11. One soothing result of the court's conclusion that it need not consider the "traditional" test is that the court can bypass discussion on the *Spencer* versus *Mitchell* "use" factor dispute. *See supra* n. 6.

We were the sole shareholders of a corporation formed under the name of American Campgrounds, Inc., a Texas corporation. Said corporation is now defunct, and no longer does business. At the time of the dissolution of this corporation, we were the only shareholders. We have personally assumed all liabilities of the corporation, and have continued to operate said corporation as a sole proprietorship.

Then, in 1996, Perry and his wife executed a Homestead Declaration, claiming both the 59 acre tract and the 26 acre tract as their homestead. The execution of these two documents raises the final question to be determined by the court: did Perry reacquire title to the 26 acre tract in 1993, such that he could reassert a homestead interest in the tract in 1996? Assuming arguendo that Perry did reacquire an interest in the 26 acre tract, this court concludes that because the 26 acre tract is used for business purposes, it does not qualify as a "rural homestead" under Texas law.

The 26 acre tract is adjacent to its bigger sibling, the 59 acre tract. Like the 59 acre tract, the 26 acre tract is located six miles away from the closest city or town (Del Rio), the land is nowhere near platted or subdivided land and it sits well outside the reach of Del Rio's extraterritorial jurisdiction. By definition, then, the 26 acre tract fails the first prong of the "urban" test under § 41.002(c)(1) and must be classified as rural property. Based on this conclusion, it would be natural for the court to tape the contiguous 59 and 26 acre tracts together and allow Perry to exempt both tracts as his "rural homestead." *Matter of Bradley*, 960 F.2d at 508–09 ("Texas law does not favor the severance of a single contiguous tract of land into homestead and non-homestead sections."); *Youngblood v. Youngblood*, 124 Tex. 184, 76 S.W.2d 759, 760 (1934) (contiguity of parcels presents a situation favorable to the extension of the homestead to the outside boundaries of the land).[12] But the operation of a business on the 26 acre tract, discussed below, prevents us from doing so.

 Unlike an urban homestead, a rural homestead cannot "encompass a 'business homestead,' and indeed, the operation of a business on part of a rural homestead forfeits the homestead protection *on that part of the property.*" *Matter of Bradley*, 960 F.2d at 506 n. 6 (emphasis added) (citing *O'Brien v. Woeltz*, 94 Tex. 148, 58 S.W. 943, 945 (1900)).[13] Aside from

---

12. The 59 acre tract and the 26 acre tract fall well below the 200 acre limit imposed on family's rural homestead. Tex. Prop.Code § 41.002(b)(1).

13. The date of the *Bradley* case, and those that follow it, leads this court to conclude that the 1989 amendments to § 41.002 did not do away with the "business homestead" exception to rural homesteads; that is, the operation of business on a rural homestead still forfeits the homestead protection on that piece of the property. This conclusion is supported by the plain language of § 41.002, which specifically approves the operation of a calling or business on an urban homestead (with limited exceptions), but makes no reference to the operation of a calling or business on a rural homestead. *See* Tex. Prop.Code § 41.002(a). There is a bit of a puzzle in all of this, however. One the one hand it is well-settled Texas law that the operation of a calling or business on a rural homestead forfeits the homestead protection on that piece of property. *Bradley*, 960 F.2d at 506 n. 6. On the other hand, the "use" factor of the "traditional" test, *see supra* n. 6, asks whether the property is used for the "support of the family." *See Ratliff v. Smith*, 178 S.W.2d 138, 140 (Tex.Civ.App.—El Paso 1943, writ ref'd); *Vaden v. Collier*, 253 S.W. 889, 891 (Tex.Civ.App.—Fort Worth 1923, no writ). Putting the two hands together produces an odd result: the property must be used for the support of the family, but it cannot be used for a calling or business. Fortunately, this case does not call upon this court to solve this puzzle.

business operations, "the rural homestead does include all land—up to the limit of two hundred acres—that is used for the support of the debtor and her family." *See id.* (citing *Clark v. Salinas,* 626 S.W.2d 118, 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); *Sims v. Beeson,* 545 S.W.2d 262, 263 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.)).[14]

■■■■■ Evidence presented at the two hearings showed that the 26 acre tract is used as a mobile home park, renting to some year-round tenants, and to some R.V. tenants. Although the mere renting of property is generally insufficient to establish the "operation of a business" on part of a rural homestead,[15] renting will constitute a business if it "occupies the time, labor, and efforts of its owner or operator." *Orr v. Orr,* 226 S.W.2d 172, 176 (Tex.Civ.App.—Armarillo 1948). In the *Orr* case, the court found the following factors helpful in determining whether the renting of property constituted a business: (1) whether the owner had other income or means of living and had other businesses or professions; (2) whether the owner spent all of his or her time, together with the hired help, in operating the rented property; (3) whether the owner used all of the land and improvements thereon for the renting of the property; (4) whether the owner used all of the proceeds from the renting of the property over and above his or her living expenses and the necessary operating expenses to pay taxes, repair and further improve the premises. *See id.* at 176.

■■■■■ When the Perrys executed the 1993 affidavit, they testified: "We have personally assumed all liabilities of the corporation, and have continued to operate said corporation as a sole proprietorship." At the hearings, Perry testified that prior to 1993, he delegated the management responsibilities of the 26 acre tract to another individual. Since 1993, however, Perry admitted that he has managed the property by himself. Perry also testified that the 26–acre tract continues to cater to year-round mobile home park tenants and to R.V. tenants. The evidence also showed that the mobile home park has its own water and sewer system, swimming pool, and other recreational facilities, all of which require substantial upkeep, and all of which also serve to attract business to this property. One photograph introduced into evidence showed a large billboard advertising the property as a campground and another photograph showed a bus that is used to take campers to a nearby lake. Finally, no evidence was introduced which

14. In order for there to be a business homestead, there must be a calling or business being exercised on the property. *In re Finkel,* 151 B.R. 779, 782 (Bankr.W.D.Tex.1993). The *Finkel* court observed:

> In *Waggener v. Haskell,* the court defined "calling" as "the usual occupation, profession, or employment; [sic] vocation" of a party. The term "business" is "that which busies or occupies one's time, attention, and labor as his chief concern; that which one does for livelihood; occupation; employment." *Waggener v. Haskell,* 89 Tex. 435, 35 S.W. 1, 2 (1896).

*Id.* at 782. The term "business" has been held to embrace every "legitimate avocation by which honest support of a family may be obtained." *C.D. Shamburger Lumber Co. v. Delavan,* 106 S.W.2d 351, 356 (Tex.Civ.App.—Amarillo 1937, writ ref'd).

15. *See e.g., Duncan v. Woolf,* 380 S.W.2d 862, 868 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e.); *C.D. Shamburger Lumber Co. v. Delavan,* 106 S.W.2d at 357; *Mays v. Mays,* 43 S.W.2d 148, 152 (Tex.Civ.App.—Beaumont 1931, no writ); *Lyon v. Files,* 50 Tex.Civ.App. 630, 110 S.W. 999, 1001 (1908, no writ). Renting activity is generally classified as investment activity rather than a business or calling, because it requires little time and attention and does not comport with the general accepted notions of business. *C.D. Shamburger Lumber Co. v. Delavan,* 106 S.W.2d at 357.

indicates that Perry had or now has an alternative source of income other than what he earns from renting out space on the 26 acre tract. Based on these pieces of evidence and the guidance of the *Orr* court, the court finds that the 26 acre tract is used for business purposes and, pursuant to *Bradley,* forfeits the rural homestead protection on that property.[16]

### IV. Conclusion

Perry can exempt the 59 acre tract from his bankruptcy estate because the tract qualifies as a "rural homestead" under the laws of Texas. The Dearings' objection thereto is overruled. The 26 acre tract, however, continues to be used for business purposes and, as such, cannot qualify as a "rural homestead" under Texas law. The Bank's and Dearings' objection to the exempt status of the 26 acre tract are sustained.

So ORDERED.

**16.** It bears noting here that the cases elide the "business purpose" that *disqualifies* a property as rural homestead and the "use as a rural homestead" that *qualifies* a given property as rural homestead. We do not here attempt to reconcile these superficially conflicting lines of authority. However, it appears that, if one's business is "farming," that is a business purpose that would not be considered to disqualifying. The intention of the courts seems clear enough—rural property enjoys its special exempt status out of a solicitude for those who make their livelihood and support their families by engaging in farming activity (and so need enough property to grow crops or raise livestock). Those who live in the country, but who conduct nonfarming business activity, by contrast, are presumed not to need all that extra acreage, and so should not enjoy the special protections of exemption.